765 N.E.2d 1002 (2002)
199 Ill.2d 47
262 Ill.Dec. 394
Emilio REDA et al. (Susan Capra, Contemnor-Appellant),
v.
ADVOCATE HEALTH CARE et al., Appellees.
No. 90487.
Supreme Court of Illinois.
February 22, 2002.
*1004 Robert P. Sheridan, Chicago, for appellant.
Cassiday, Schade & Gloor, of Chicago (James W. Kopriva, Donald F. Ivansek and Morgan M. Strand, of counsel), for appellees Lutheran General Hospital and T. Cappello.
Iwan, Cray, Huber, Horstman & VanAusdal, L.L.C., of Chicago (James K. Horstman and Rodney E. VanAusdal, of counsel), for appellee Melvin P. Katz.
Hegarty & Heath, of Chicago (Timothy W. Heath, of counsel), for amicus curiae Illinois Trial Lawyers Association.
Justice FREEMAN delivered the opinion of the court:
During discovery in a medical malpractice action, the circuit court of Cook County twice ordered plaintiffs, Emilio and Mary Reda, to disclose Emilio's psychiatric records to defendants, Advocate Health Care, formerly doing business as Lutheran General Hospital, Inc. (hospital); Dr. Theresa Cappello; and Dr. Melvin Katz. Plaintiffs' attorney, Susan Capra, refused, invoking the mental health therapist-patient privilege under the Mental Health and Developmental Disabilities Confidentiality Act (Act) (740 ILCS 110/1 et seq. (West 2000)). The court held Capra in civil contempt for refusing to comply with its discovery orders.
The appellate court, inter alia, upheld the disclosure of Emilio's psychiatric records. 316 Ill.App.3d 1115, 250 Ill.Dec. 189, 738 N.E.2d 153. We allowed Capra's petition for leave to appeal. 177 Ill.2d R. 315(a). We now reverse the appellate and circuit courts, and remand the cause to the circuit court for further proceedings.

BACKGROUND
Plaintiffs' first amended complaint alleged as follows. On June 6, 1994, Emilio was admitted to the hospital, coming under its care and the care of Drs. Cappello and Katz, for the treatment of arthritis in his right knee. That day, Dr. Katz performed a total right knee arthroplasty, i.e., knee replacement. As a result of the surgery, Emilio developed an acute thrombosis of the popliteal artery in his right leg. Defendants failed in several respects to timely diagnose and treat this worsening condition. As a proximate result of defendants' negligence, Emilio "sustained injuries of a personal and pecuniary nature." Emilio sought recovery for these injuries (count I), and as a result of Emilio's injuries, Mary sought recovery for the loss of Emilio's society, companionship, and affection (count II). In their answers, defendants denied that plaintiffs were injured as alleged.
In subsequent interrogatories, Dr. Katz and the hospital each asked Emilio to specify his claimed injuries. Emilio answered each interrogatory as follows:
"I am not a medical doctor. Thus, I can only state what I believe my problems are in laymen's terms. As a result of the occurrence, I suffered severe injuries to my leg (toes amputated and calf muscle removed) which have resulted in *1005 disability, disfigurement, pain and suffering. I also suffered a stroke, heart problems and kidney problems. I would refer you to the Lutheran General Hospital records for details; Investigation continues."
We note that Emilio's hospital records were not included in the record on appeal.
Plaintiffs filed their current complaint on December 17, 1996. During pretrial discovery, defendants requested from Dr. Samuel DeLisi Emilio's treatment records. Dr. DeLisi refused, explaining that Emilio had not authorized their release. Plaintiffs objected to defendants' discovery request, invoking the mental-health therapist-patient privilege. On November 14, 1997, defendants Cappello and the hospital moved to compel Emilio to authorize the release of his psychiatric records from Dr. DeLisi.
On January 19, 1998, Emilio and Mary each testified at a discovery deposition. During Emilio's deposition, attorneys from both sides agreed that questions regarding Dr. DeLisi's psychiatric treatment of Emilio would be deferred pending resolution of the motion to compel. The record contains the following pertinent excerpts from Emilio's deposition:
"Q. [Defense counsel] All right. My question related to whether any doctor told you that you had sustained any type of stroke. * * * Did someone tell you that or use those terms?
A. I don't know about if I sustained stroke damage, but he said I had brainhe determined I had brain damage. He gave me a puzzle to work out, 17 pieces. I couldn't put the puzzle together. Then, he did a couple other tests.
And in more polite terms, he classified me one step above an idiot.
* * *
Q. Okay. At Lutheran General Hospital, did any physician or doctor tell you that you had a stroke, of any type?
* * *
A. Not that I remember.
* * *
Q. And then, you've told us a little bit about your headaches. I want to ask you just a few more questions about that.
How frequently do you have headaches, nowadays, in general? Is it like every day, every couple of days?
A. Sir, them headaches have not gone away. I had Dr.the shrink, I kept accusing him
MS. CAPRA: We're not going to talk about him.
THE WITNESS: Okay. I'm sorry."
During defense counsel's questioning of Emilio regarding his headaches, the following colloquy occurred:
"Q. * * * When did you start having those headaches?
A. I can't remember how far back they were, if they were there all the time. I don't remember, sir.
Q. Did you have any headaches like the ones you've just described for me before you went to Lutheran General for your surgery?
A. No, sir. I never hadI wouldn't even take aspirins for anything. I didn't believe in any medication for the head. I never took nothing.
Q. Do you take anything for the headaches now?
A. I don't take them for the headaches. I take them more for the heart andI will not take medicine for headaches, sir."
*1006 During Mary's deposition, defense counsel questioned her regarding, inter alia, Emilio's injuries. Answering their questions, Mary testified regarding Emilio's comprehension following the surgery. She testified that Emilio was not able to perform many tasks, e.g., operating a shower faucet and cutting his food with a knife. Mary also testified that Emilio was "very emotional" and "very frustrated." Mary also referred to Emilio's lack of affection subsequent to the surgery. She testified: "He'she can be very mean, extremely mean. And I'm always at fault. I make wrong decisions, everything. It's a hard situation. Sometimes I want to go crawl under the bed and stay there for ten days."
On February 20, 1998, the circuit court denied, without prejudice, the motion to compel production of Emilio's psychiatric records. The court did not have before it plaintiffs' deposition testimony. On April 7, 1998, based on plaintiffs' depositions, Dr. Cappello and the hospital sought rehearing on their motion to compel. On August 20, 1998, the circuit ordered plaintiffs to submit Emilio's psychiatric records to the court for an in camera inspection. On November 5, 1998, the court ordered plaintiffs to disclose Emilio's psychiatric records to defendants. On March 17, 1999, the court denied plaintiffs' motion to vacate the disclosure order and again ordered plaintiffs to disclose Emilio's psychiatric records to defendants.
On April 6, 1999, the circuit court held plaintiffs' attorney, Susan Capra, in civil contempt for refusing to comply with the court's discovery orders. The court fined Capra $100 plus $10 per day until Capra disclosed Emilio's psychiatric records to defendants.
The appellate court, with one justice dissenting, upheld the disclosure of Emilio's psychiatric records. The court concluded that, under the Act, Emilio had placed his mental condition at issue in this litigation. 316 Ill.App.3d at 1118-19, 250 Ill.Dec. 189, 738 N.E.2d 153. Further, the appellate court upheld the circuit court's determination that the remaining statutory requirements for disclosure were met. 316 Ill. App.3d at 1119, 250 Ill.Dec. 189, 738 N.E.2d 153. The appellate court also vacated the circuit court's order of contempt against Capra, finding that Capra was not contemptuous of the circuit court, but rather had subjected herself to a contempt finding only to secure appellate review of the circuit court's disclosure orders. 316 Ill.App.3d at 1119, 250 Ill.Dec. 189, 738 N.E.2d 153.
The dissent concluded that Emilio had not placed his mental condition at issue in the medical malpractice action. Rather, the dissent opined, plaintiffs merely answered defense counsel's questions during their depositions, and that their truthful answers did not give rise to disclosure under the Act. 316 Ill.App.3d at 1119-20, 250 Ill.Dec. 189, 738 N.E.2d 153 (South, J., dissenting).
Capra appeals from the judgment of the appellate court. We granted the Illinois Trial Lawyers Association leave to submit an amicus curiae brief in support of plaintiffs. 155 Ill.2d R. 345.

DISCUSSION

I. Scope and Standard of Review
Because discovery orders are not final orders, they are not ordinarily appealable. Norskog v. Pfiel, 197 Ill.2d 60, 69, 257 Ill.Dec. 899, 755 N.E.2d 1 (2001). Rather, they are reviewable on appeal from the final judgment. People ex rel. Scott v. Silverstein, 87 Ill.2d 167, 171, 57 Ill.Dec. 585, 429 N.E.2d 483 (1981).
*1007 However, it is well settled that a contempt proceeding is an appropriate method for testing the correctness of a discovery order. Norskog, 197 Ill.2d at 69, 257 Ill.Dec. 899, 755 N.E.2d 1; People ex rel. General Motors Corp. v. Bua, 37 Ill.2d 180, 189, 226 N.E.2d 6 (1967) (collecting cases); Lewis v. Family Planning Management, Inc., 306 Ill.App.3d 918, 922, 240 Ill.Dec. 56, 715 N.E.2d 743 (1999). When an individual appeals from a contempt sanction imposed for violating, or threatening to violate, a discovery order, the contempt finding is final and appealable and presents to the reviewing court the propriety of that discovery order. See Norskog, 197 Ill.2d at 69, 257 Ill.Dec. 899, 755 N.E.2d 1; Silverstein, 87 Ill.2d at 171-72, 174, 57 Ill.Dec. 585, 429 N.E.2d 483.
Generally, a trial court's rulings on discovery matters will not be disturbed on appeal absent a manifest abuse of discretion. However, the applicability of a statutory evidentiary privilege, and any exceptions thereto, are matters of law subject to de novo review. Norskog, 197 Ill.2d at 70-71, 257 Ill.Dec. 899, 755 N.E.2d 1; D.C. v. S.A., 178 Ill.2d 551, 559-60, 227 Ill.Dec. 550, 687 N.E.2d 1032 (1997). In this case, the determination of whether Emilio introduced his mental condition as an element of his claim, so as to waive the statutory mental-health therapist-patient privilege, is a matter of law subject to de novo review. However, the circuit court's secondary findings required under the Act are factual questions subject to an abuseof-discretion standard. D.C., 178 Ill.2d at 560, 227 Ill.Dec. 550, 687 N.E.2d 1032.

II. The Mental-Health Therapist-Patient Privilege
In determining whether Emilio's psychiatric records are privileged under the Act, it is first necessary to look at the language of the Act itself. See Niven v. Siqueira, 109 Ill.2d 357, 365, 94 Ill.Dec. 60, 487 N.E.2d 937 (1985). The legislative intent of a statute is best determined from the plain and ordinary meaning of the statutory language. Bonaguro v. County Officers Electoral Board, 158 Ill.2d 391, 397, 199 Ill.Dec. 659, 634 N.E.2d 712 (1994); see, e.g., People v. Pawlaczyk, 189 Ill.2d 177, 195, 244 Ill.Dec. 13, 724 N.E.2d 901 (2000). If the legislative intent is clear from the statutory language, the court must confine its inquiry to a consideration of that language and must not look to extrinsic aids. People ex rel. Baker v. Cowlin, 154 Ill.2d 193, 197, 180 Ill.Dec. 738, 607 N.E.2d 1251 (1992). Where the language is clear and unambiguous, we must apply it as written. Paris v. Feder, 179 Ill.2d 173, 177, 227 Ill.Dec. 800, 688 N.E.2d 137 (1997); see Sassali v. Rockford Memorial Hospital, 296 Ill.App.3d 80, 83, 230 Ill.Dec. 536, 693 N.E.2d 1287 (1998). However, if the statutory language is susceptible of more than one interpretation, the court may look beyond the language to consider the purposes of the statute. In re B.C., 176 Ill.2d 536, 542-3, 223 Ill.Dec. 919, 680 N.E.2d 1355 (1997); see Sisters of the Third Order of St. Francis v. People ex rel. Barra, 151 Ill.App.3d 875, 877-78, 105 Ill.Dec. 63, 503 N.E.2d 1069 (1987).
The Act provides: "All records and communications shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/3(a) (West 2000). The records made confidential under the Act refer to "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient concerning the recipient and the services provided"; the communications made confidential under the Act refer to "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or *1008 in connection with providing mental health or developmental disability services to a recipient. Communication includes information which indicates that a person is a recipient"; and "`[recipient' means a person who is receiving or has received mental health or developmental disabilities services." 740 ILCS 110/2 (West 2000).
Section 10(a) of the Act provides: "Except as provided herein, in any civil, criminal, administrative, or legislative proceeding * * * a recipient, and a therapist on behalf and in the interest of a recipient, has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications." 740 ILCS 110/10(a) (West 2000). Section 10(a) then lists exceptions to this evidentiary privilege. The first exception, which is at issue in this case, provides in pertinent part:
"(1) Records and communications may be disclosed in a civil, criminal or administrative proceeding in which the recipient introduces his mental condition or any aspect of his services received for such condition as an element of his claim or defense, if and only to the extent the court in which the proceedings have been brought * * * finds, after in camera examination of testimony or other evidence, that it is relevant, probative, not unduly prejudicial or inflammatory, and otherwise clearly admissible; that other satisfactory evidence is demonstrably unsatisfactory as evidence of the facts sought to be established by such evidence; and that disclosure is more important to the interests of substantial justice than protection from injury to the therapist-recipient relationship or to the recipient or other whom disclosure is likely to harm. * * * [F]or purposes of this Act, * * * in any action in which pain and suffering is an element of the claim, mental condition shall not be deemed to be introduced merely by making such claim and shall be deemed to be introduced only if the recipient or a witness on his behalf first testifies concerning the record or communication." 740 ILCS 110/10(a)(1) (West 2000).
Thus, before the circuit court can order disclosure, it must find that the recipient has introduced his mental condition as an element of his claim or defense. The recipient does not introduce his mental condition merely by claiming pain and suffering. If the recipient has not placed his mental health at issue, disclosure of the records or communications is not permitted. If the recipient has introduced his mental condition, the court must conduct an in camera examination of the evidence to determine if it is, inter alia, relevant, probative, and not unduly prejudicial.
The appellate court held that Emilio had introduced his mental condition as an element of his claim. The court observed that plaintiffs, in their depositions, testified regarding Emilio's headaches, loss of memory, decline in comprehension, difficulties in performing daily activities, and changes in personality. The appellate court reasoned:
"Plaintiffs contend that Emilio's marked changes in personality, loss of memory, deficits in comprehension and difficulty performing routine tasks are neurological injuries only. We, however, believe that these `injuries' may be reasonably interpreted or characterized as psychological traumas. Accordingly, we believe that testimony given by plaintiffs regarding these `injuries' placed Emilio's mental health at issue." 316 Ill.App.3d at 1119, 250 Ill.Dec. 189, 738 N.E.2d 153.
Assigning error to the appellate court, Capra contends that Emilio "suffered brain damage, which has produced many *1009 behavioral consequences" and that he now is experiencing "physical limitations and the everyday frustrations that go along with them." Capra urges an interpretation of "mental condition," as used in the Act, that excludes physical injuries. Agreeing with the appellate court, defendants contend that Emilio's "cognitive deficiencies" may have been "a manifestation of a mental condition completely unrelated to his medical treatment." Defendants urge an interpretation of "mental condition" that includes physical injuries with a psychological component.
We agree with Capra that Emilio had not introduced his mental condition as an element of his medical malpractice claim. Therefore, he has not waived the statutory privilege, and disclosure of his psychiatric records is not permitted.
Emilio did not place his mental condition at issue merely by claiming damages for what is a neurological injury, i.e., stroke and/or other brain damage. As the dissenting justice in the appellate court aptly noted: "A neurological injury is not synonymous with psychological damage * * * Nor does neurological injury directly implicate psychological damage." 316 Ill.App.3d at 1120, 250 Ill.Dec. 189, 738 N.E.2d 153 (South, J., dissenting). If that were true, in every case in which the plaintiff claimed damages stemming from a physical injury to the brain, the door to discovery of the plaintiff's mental-health records would automatically open, and the limited exception in section 10(a)(1) of the Act would effectively eviscerate the privilege.
Our interpretation of section 10(a)(1) of the Act accords with earlier case law. Interpreting a predecessor statute, our appellate court held that a litigant claiming pain and suffering does not ipso facto place his or her mental condition at issue. See Tylitzki v. Triple X Service, Inc., 126 Ill.App.2d 144, 148-50, 261 N.E.2d 533 (1970); Webb v. Quincy City Lines, Inc., 73 Ill.App.2d 405, 407-09, 219 N.E.2d 165 (1966). The court in Webb found it difficult to conclude that one undergoing pain and suffering necessarily suffers deterioration in mental condition, and held that a mere allegation of pain and suffering originating in physical trauma did not ipso facto result in "trauma affecting the mentality." Webb, 73 Ill.App.2d at 408, 219 N.E.2d 165. The court refused to "open a Pandora's box of inquiry into the mental condition of the claimant where it is not specifically made a part of the claim." Webb, 73 Ill.App.2d at 409, 219 N.E.2d 165.
Even if, as defendants maintain, the psychiatric records have a bearing on causation, relevancy is not decisive of whether a plaintiff has introduced his mental condition as an element of his claim. D.C., 178 Ill.2d at 566, 227 Ill.Dec. 550, 687 N.E.2d 1032; see Tylitzki, 126 Ill.App.2d at 148-51, 261 N.E.2d 533 (rejecting argument that questioning of plaintiff's psychiatrist was necessary to determine whether claim of pain and suffering resulted from physical trauma sustained in the accident or from some other cause). Although defendants might be denied access to information that could benefit their case, any "unfairness" is the same that is present any time a privilege against disclosure is exercised. Evidentiary privileges, generally, "'are not designed to promote the truth-seeking process, but rather to protect some outside interest other than the ascertainment of truth at trial.'" Norskog, 197 Ill.2d at 83, 257 Ill.Dec. 899, 755 N.E.2d 1, quoting D.C., 178 Ill.2d at 561-62, 227 Ill.Dec. 550, 687 N.E.2d 1032.
Moreover, it is not enough that defendants, under their theory of the case, placed Emilio's mental condition at issue. Also, while Mary had her own case for loss *1010 of society, she could not place Emilio's mental condition at issue in his case. To waive the statutory privilege, the Act requires the "recipient" of mental-health services to introduce his or her mental condition. 740 ILCS 110/10(a)(1) (West 2000); D.C., 178 Ill.2d at 564-65, 227 Ill.Dec. 550, 687 N.E.2d 1032; see People v. Gemeny, 313 Ill.App.3d 902, 911, 247 Ill.Dec. 71, 731 N.E.2d 844 (2000) (collecting cases) (section 10(a)(1) exception applies only when a party affirmatively places his or her own mental condition at issue). The court in Tylitzki, 126 Ill.App.2d at 149, 261 N.E.2d 533, explained:
"[I]t is the affirmative aspect which should be controlling. The privilege is too important to be brushed aside when the mental condition of the plaintiff may be only peripherally involved. It is not difficult to consider the many ways in which it could be argued that mental conditions were at issue, and soon there would exist more areas of inquiry deemed exceptions to the privilege than there would be areas of inquiry protected by the privilege."
Our conclusion supports, and is supported by, the purpose of the Act. The Act represents a comprehensive revision and repeal of previous statutes pertaining to psychotherapeutic communications. See Laurent v. Brelji, 74 Ill.App.3d 214, 216, 30 Ill.Dec. 164, 392 N.E.2d 929 (1979). When viewed as a whole, the Act constitutes a strong statement by the General Assembly about the importance of keeping mental-health records confidential. Norskog, 197 Ill.2d at 71-72, 257 Ill.Dec. 899, 755 N.E.2d 1. Confidentiality motivates persons to seek needed treatment. Further, by encouraging complete candor between patient and therapist, confidentiality is essential to the treatment process itself. Norskog, 197 Ill.2d at 72, 257 Ill.Dec. 899, 755 N.E.2d 1 (and cases cited therein).
The legislature carefully drafted the Act to maintain the confidentiality of mental-health records except in the specific circumstances explicitly enumerated. In each case where disclosure is allowed under the Act, the legislature has been careful to restrict disclosure to that which is necessary to accomplish a particular purpose. Exceptions to the Act are narrowly crafted. Norskog, 197 Ill.2d at 71, 257 Ill.Dec. 899, 755 N.E.2d 1. "Consequently, anyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act." Norskog, 197 Ill.2d at 72, 257 Ill.Dec. 899, 755 N.E.2d 1.
We note the suggestion of amicus that the determination of whether Emilio has placed his mental condition at issue should be based solely on the allegations of the underlying complaint. While pertinent cases contain references to pleadings (see, e.g., D.C., 178 Ill.2d at 566, 227 Ill.Dec. 550, 687 N.E.2d 1032; Tylitzki, 126 Ill.App.2d at 151, 261 N.E.2d 533; Webb, 73 Ill.App.2d at 409, 219 N.E.2d 165), section 10(a)(1) of the Act does not contain such a limitation. In interpreting a statute, it is never proper for a court to depart from plain language by reading into a statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent. County of Knox ex rel. Masterson v. The Highlands, L.L.C., 188 Ill.2d 546, 556, 243 Ill.Dec. 224, 723 N.E.2d 256 (1999). A party may introduce his or her mental condition in several ways during the course of litigation, including, e.g., in the pleadings, answers to written discovery, a deposition, in briefs or motions, in argument before the court, or by stipulation. Based on the record before us, we hold that Emilio had not introduced his mental condition as an element of his *1011 claim as required by section 10(a)(1) of the Act.
We lastly observe that the fundamental fairness exception to the mentalhealth therapist-patient privilege (see D.C., 178 Ill.2d 551, 227 Ill.Dec. 550, 687 N.E.2d 1032) does not apply here. In D.C., we agreed with the appellate court that the plaintiff had not introduced his mental condition into the case within the meaning of section 10(a)(1) of the Act. D.C., 178 Ill.2d at 566-67, 227 Ill.Dec. 550, 687 N.E.2d 1032. However, this court held that "fundamental fairness commands that the privilege yield." D.C., 178 Ill.2d at 568, 227 Ill.Dec. 550, 687 N.E.2d 1032. We have explained this holding as follows:
"Underpinning this ruling was our refusal to place our imprimatur on plaintiff's wielding the privilege as a sword to manipulate the legal system, coupled with the recognition that, after in camera inspection, the trial court restricted discovery to information which met all other requirements of section 10(a)(1) of the Act and had little to do with plaintiff's mental health treatment and more to do with plaintiff's conduct at the time of the accident. Furthermore, the information was obtainable from no other source and could, potentially, absolve defendants of any liability and bar plaintiff's recovery. We concluded that, on balance, the interests of substantial justice and fundamental fairness outweighed plaintiff's right to assert the confidentiality privilege under the unique facts of the case." Norskog, 197 Ill.2d at 82, 257 Ill.Dec. 899, 755 N.E.2d 1, explaining D.C., 178 Ill.2d 551, 227 Ill.Dec. 550, 687 N.E.2d 1032.
As in Norskog, the facts in this case are distinguishable from those in D.C. The record here does not show that plaintiffs are invoking the mental-health therapistpatient privilege to exploit or subvert the legal process. "Indeed, the confidentiality privilege is being employed precisely as intended-to shield information which our legislature has seen fit to protect." Norskog, 197 Ill.2d at 83, 257 Ill.Dec. 899, 755 N.E.2d 1.
Also, unlike D.C., information regarding Emilio's injuries is available from several additional sources. The record contains references to Emilio's medical records maintained by the hospital and various physicians. Defendants may question and contest all opinions and conclusions contained therein. Specifically regarding Emilio's mental condition, defendants may have Emilio tested or examined by a mental-health expert and present a defense based on the expert's opinion. See 166 Ill.2d R. 201(a); accord 4 R. Michael, Illinois Practice § 31.3, at 104 (1989) ("The physical or mental condition of any party whose condition is in issue may be examined by an expert chosen by the adverse party"). Thus, defendants would be able to argue that any or all of Emilio's behavioral or cognitive limitations are based on a mental condition and not their negligence.
Also, unlike D.C., there is absolutely no indication that anything that might be revealed in Emilio's mental-health records would completely bar his recovery and absolve defendants of liability. See Norskog, 197 Ill.2d at 83-84, 257 Ill.Dec. 899, 755 N.E.2d 1. Any information contained in Emilio's psychiatric records would go only to damages and not liability. Plaintiffs seek damages for several severe physical injuries.
As we concluded in Norskog:
"In sum, the fundamental fairness considerations which drove our opinion in D.C. are not present in this case. Absent truly extraordinary circumstances, not present here, the statutory privilege must prevail. To recognize a *1012 fundamental fairness exception in this case would eviscerate the statutory privilege." Norskog, 197 Ill.2d at 85, 257 Ill.Dec. 899, 755 N.E.2d 1.
Our disposition of this appeal obviates the need to address other issues raised by the parties, such as the existence or sufficiency of the circuit court's findings regarding the Act's secondary requirements. See Norskog, 197 Ill.2d at 80, 257 Ill.Dec. 899, 755 N.E.2d 1.
Accordingly, we reverse the judgment of the appellate court and the circuit court's discovery order. Further, we reverse the contempt finding against Capra on this basis. See In re Marriage of Bonneau, 294 Ill.App.3d 720, 723, 229 Ill.Dec. 187, 691 N.E.2d 123 (1998) ("where the trial court's discovery order is invalid, a contempt judgment for failure to comply with the discovery order must be reversed").

CONCLUSION
For the foregoing reasons, the judgment of the appellate court and the discovery order of the circuit court of Cook County are reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.
Appellate court reversed; circuit court reversed; cause remanded.