# Illinois Official Reports

## Appellate Court

*Stuckey v. The Renaissance at Midway, Inc.*, 2015 IL App (1st) 143111

| | |
|---|---|
| Appellate Court Caption | JOHNNIE STUCKEY, as Attorney-in-Fact for Robert Holman, Plaintiff-Appellee, v. THE RENAISSANCE AT MIDWAY, INC., an Illinois Corporation, d/b/a The Renaissance at Midway; NUCARE SERVICES CORPORATION, an Illinois Corporation; CLINICAL CONSULTING SOLUTIONS, LLC, an Illinois Limited Liability Company; and QUEST SERVICES CORPORATION, an Illinois Corporation, Defendants-Appellants (Rodd E. Elges and Clausen and Miller, P.C., Contemnors-Appellants). |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-3111 |
| Filed | December 18, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-000564; the Hon. Jeffrey Lawrence, Judge, presiding. |
| Judgment | Reversed and remanded. Contempt order vacated. |
| Counsel on Appeal | Clausen Miller P.C., of Chicago (Edward M. Kay, Melinda S. Kollross, Rodd E. Elges, and Mark J. Sobczak, of counsel), for appellants.<br><br>Levin & Perconti (Michael F. Bonamarte, of counsel), and Leslie J. Rosen Attorney at Law P.C. (Leslie J. Rosen, of counsel), both of Chicago, for appellee. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff-appellee, Johnnie Stuckey, as attorney-in-fact for Robert Holman, filed the instant personal injury action against defendants-appellants, The Renaissance at Midway, Inc., an Illinois corporation; Nucare Services Corporation, an Illinois corporation; Clinical Consulting Solutions, LLC, f/k/a Clinical Consulting Services, LLC, an Illinois limited liability company; and Quest Services Corporation, an Illinois corporation.[1] Plaintiff sought to recover for damages allegedly incurred by Mr. Holman when, while he was a resident at a long-term care facility owned, operated, and/or managed by defendants, he was physically assaulted by another resident.

¶ 2    This appeal was filed after the circuit court granted, in part, plaintiff's motion to compel regarding plaintiff's discovery requests, conducted an *in camera* review, ordered defendants to produce certain partially-redacted records regarding the resident who assaulted Mr. Holman, and found defense counsel in "friendly contempt" for counsel's refusal to produce those records. For the following reasons, the circuit court's discovery orders are reversed and its order finding defense counsel in "friendly contempt" and imposing a fine for the refusal to comply with those discovery orders is vacated.

¶ 3                          I. BACKGROUND

¶ 4    Plaintiff, Mr. Holman's sister and attorney-in-fact, filed the instant lawsuit on January 17, 2013. In the complaint, it was alleged that in January of 2011, Mr. Holman–born on June 12, 1933–was a resident at a long-term care facility known as The Renaissance at Midway (Renaissance) in Chicago. Defendants were alleged to be the owners, operators, and/or managers of Renaissance. On or about January 22, 2011, Mr. Holman was physically assaulted by another resident, allegedly causing his left eye to suffer hyphema, a fracture and globe rupture, and a reduction of vision. The complaint sought to recover for Mr. Holman's injuries, asserting various violations of the Nursing Home Care Act (Act) (210 ILCS 45/1-101 *et seq.* (West 2010)), and acts of negligence against defendants. The other resident was not named a defendant in the complaint.

¶ 5    The record reflects that, prior to filing suit, a complaint regarding the incident involving Mr. Holman was filed by plaintiff with the Illinois Department of Public Health (IDPH). On or about April 13, 2012, the IDPH concluded its investigation and found that the Renaissance was in violation of certain provisions of the Act. Factual findings attached to the IDPH report, based upon an interview and a review of Renaissance's records, asserted that Mr. Holman and the other resident (referred to as "R10" by the IDPH, but hereinafter referred to as "John Doe") were roommates at Renaissance. In addition to the incident involving Mr. Holman on January

---

[1]Although additional parties were originally named as defendants, those parties were dismissed below and they are not parties to this appeal.

22, 2011, the IDPH's investigation indicated that John Doe, suffering from Alzheimer's disease, "became physically aggressive toward staff and pushed staff on [a] bed" on January 6, 2011. On February 23, 2012, John Doe was described as being "severely demented."

¶ 6 In light of the IDPH findings, plaintiff propounded written discovery requests upon defendants seeking information regarding John Doe. While the written discovery requests themselves are not contained in the record on appeal, the remainder of the record makes clear that: "[p]laintiff requested in interrogatory fourteen (14) information regarding the resident who assaulted Robert Holman, including his name, address, social security number, whether a criminal background check had been completed on him and whether there were any prior incidents of aggression between this resident and any other residents or employees of the Defendant facility." In addition: "[p]laintiff also requested in interrogatory seventeen (17) [to know] whether any complaints were ever made about the conduct of the other resident involved in the January 22, 2011, incident with Robert Holman." Renaissance refused to respond to these discovery requests, asserting that they sought medical information that Renaissance was precluded from disclosing pursuant to the Health Insurance Portability and Accountability Act (HIPAA) (42 U.S.C. § 1320d *et seq.* (2012)).

¶ 7 Plaintiff, thereafter, filed a motion to compel and for an *in camera* inspection. In her motion, plaintiff contended that none of the information requested in interrogatories 14 and 17 constituted medical information and that a qualified protective order could be entered to protect John Doe's privacy. Plaintiff further contended that an "*in-camera* inspection of John Doe's medical records would ensure that any information Plaintiff receives would be relevant to the case at hand, and any medical information contained in said records could be redacted in compliance with HIPAA." Plaintiff, therefore, requested that "the nursing home chart of John Doe be produced under a qualified protective order for *in-camera* inspection."

¶ 8 Renaissance filed a written response to plaintiff's motion, wherein it contended that plaintiff "clearly seeks the production of information and documentation" protected by HIPAA, the physician-patient privilege (735 ILCS 5/8-802 (West 2014)), and the Mental Health and Developmental Disabilities Confidentiality Act (Confidentiality Act) (740 ILCS 110/1 *et seq.* (West 2014)). Renaissance rejected plaintiff's contention that no medical information had been requested, noting that plaintiff sought the production of John Doe's entire nursing home chart. Renaissance therefore asked the circuit court to deny plaintiff's motion to compel, as the "applicable statutes and relevant Illinois case law clearly establish that Defendant cannot produce information or documentation relevant to John Doe's care and treatment at the Defendant's facility, let alone his entire nursing home chart, as requested by Plaintiff."

¶ 9 Plaintiff filed a written reply, wherein she contended that neither the physician-patient privilege nor the Confidentiality Act was applicable to this matter, and that HIPAA allowed for production of John Doe's nursing home chart under a qualified protective order. Plaintiff did not assert that any exception to the Confidentiality Act authorized such disclosure.

¶ 10 A hearing on plaintiff's motion was held on May 28, 2014. At that hearing, defense counsel indicated that both Mr. Holman and John Doe were residents of Renaissance's dementia unit. Defense counsel further indicated his understanding that, while plaintiff might be entitled to John Doe's name and last known address under Illinois law, plaintiff was not entitled to John Doe's actual medical and nursing records. Plaintiff indicated that she was not interested in obtaining John Doe's actual name or other identifying information. Rather, plaintiff indicated

that she sought only information regarding John Doe's history of aggressive behavior. Thus, plaintiff stated that she would have no objection to the redaction of identifying information from any produced records, following the circuit court's *in camera* inspection. Following the hearing, the circuit court entered an order, over defendant's objection, requiring Renaissance to produce John Doe's records to defense counsel and requiring defense counsel to produce those records to the circuit court for an *in camera* inspection, along with any proposed redactions.

¶ 11 Renaissance filed a motion to reconsider the circuit court's order, contending that the circuit court had misapplied Illinois law in requiring an *in camera* inspection of the records. Alternatively, Renaissance asked the circuit court to enter a protective order with respect to those records and to provide John Doe and/or his legal representative both notice of the possible disclosure of the records and an opportunity to object to any disclosure, pursuant to HIPAA. In an order entered on July 14, 2014, the circuit court denied the former request and granted the latter.

¶ 12 This matter, again, came before the circuit court on September 11, 2014. On that date, defense counsel stated that John Doe's daughter, who had held a power of attorney, had been previously contacted. While she reportedly objected to the disclosure of John Doe's records, she was not willing to become further involved or to memorialize her objections in writing. Defense counsel also noted that over 1,000 pages of John Doe's records had been provided for an *in camera* inspection. Contending that those records clearly reflected that John Doe was admitted to Renaissance for "mental illness" and was being treated there for "mental healthcare services," defense counsel argued that all of John Doe's records were protected by the Confidentiality Act. Defense counsel further contended that the Confidentiality Act precluded disclosure even though John Doe was deceased. It is not clear from the record exactly when John Doe died, although defense counsel appears to have become aware of this fact sometime between the July 14, 2014, and September 11, 2014, hearings.

¶ 13 The circuit court concluded that the vast majority of John Doe's records were, in fact, medical records and were, therefore, not subject to production. However, the circuit court also found that a small portion of the records were discoverable in a partially redacted form that included the redaction of John Doe's actual name and other personal, identifiable information. As the circuit court explained, "what we left unredacted, principally from the nurse's notes, are any account of any physical acting out by John Doe. We think that is nonmedical information but simply an account of what he did, and we believe that the Plaintiff is entitled to receive that." Defense counsel informed the circuit court that the redacted records would not be produced, and asked the circuit court to enter a "friendly contempt." Therefore, the circuit court entered a written order which: (1) granted plaintiff's motion to compel in part and denied it in part; (2) ordered defense counsel to provide specific, partially redacted portions of John Doe's records to plaintiff; and (3) found defense counsel in contempt and fined defense counsel $100 for the failure to provide those records.

¶ 14 Following a hearing on September 29, 2014, the circuit court entered another order with respect to a final, additional set of John Doe's records that was recently discovered and submitted for *in camera* inspection. The circuit court allowed the parties to adopt their prior arguments with respect to these additional documents, and ordered a portion of them to be disclosed to plaintiff in a partially redacted form. The circuit court's order further indicated

that defense counsel also refused to produce these additional records, and noted that defense counsel remained in contempt for this refusal.

¶ 15     On October 10, 2014, defendants and their attorneys filed a notice of appeal, pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Feb. 26, 2010) (allowing for appeal of an order finding a person or entity in contempt of court which imposes a monetary or other penalty). Defendants and their attorneys sought reversal of the circuit court's orders requiring the production of a portion of John Doe's records and the order of contempt and monetary fine imposed upon defense counsel. This court subsequently granted unopposed motions filed by defendants and their defense counsel asking that this matter proceed under seal and that the partially redacted records ordered to be produced by the circuit court be filed under seal with this court for our own *in camera* inspection.

¶ 16                                II. ANALYSIS

¶ 17     On appeal, defendants contend that the circuit court erred in ordering the production of John Doe's partially redacted records, and in holding defense counsel in contempt for the refusal to do so. Defendants contend that disclosure of those records is prohibited by both the Confidentiality Act and the physician-patient privilege. We agree, because John Doe's partially redacted records were protected from disclosure under the provisions of the Confidentiality Act, plaintiff failed to show that any exception to the Confidentiality Act applies, and these conclusions are dispositive of this appeal.[2]

¶ 18     In *Norskog v. Pfiel*, 197 Ill. 2d 60 (2001), our supreme court outlined many of the standards guiding our analysis of this matter. As our supreme court noted therein:

> "Because discovery orders are not final orders, they are not ordinarily appealable. [Citations.] However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings. [Citation.] When an individual appeals contempt sanctions imposed for violating, or threatening to violate, a pretrial discovery order, the discovery order is subject to review. [Citation.] Review of the contempt finding necessarily requires review of the order upon which it is based. [Citation.]
>
>                                * * *
>
> Although a trial court's discovery order is ordinarily reviewed for a manifest abuse of discretion [citation], the proper standard of review depends on the question that was answered in the trial court [citation]. ***
>
> In this appeal, we are deciding whether disclosure of mental health information is prohibited by a statutory discovery privilege and whether any exception to the privilege applies. These are matters of law subject to *de novo* review. [Citation.]" *Id*. at 69-71.

See also *Wisniewski v. Kownacki*, 221 Ill. 2d 453, 457 (2006) (same).

¶ 19     We first address Renaissance's contention that the circuit court's orders requiring the disclosure of partially redacted portions of John Doe's records would violate the Confidentiality Act.

---

[2]We note that while this discovery dispute began as a result of defendants' refusal to answer plaintiff's interrogatories, it ended with defendants' refusal to comply with the circuit court's orders requiring the disclosure of portions of John Doe's actual records. Regardless of what plaintiff initially requested, we review the circuit court's orders requiring disclosure of the actual records.

¶ 20    The Confidentiality Act broadly provides: "All records and communications shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/3(a) (West 2014). The "records" made confidential under the Confidentiality Act are defined to include "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient concerning the recipient and the services provided." 740 ILCS 110/2 (West 2014). The "communications" made confidential under the Confidentiality Act are defined to include "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient. Communication includes information which indicates that a person is a recipient." *Id*. A "recipient" is defined as "a person who is receiving or has received mental health or developmental disabilities services," while "mental health or developmental disabilities services" or "services" specifically "includes but is not limited to examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation." *Id*. Finally, a "therapist" is defined to include "a psychiatrist, physician, psychologist, social worker, or nurse providing mental health or developmental disabilities services." *Id*. The Confidentiality Act also contains a number of specific, narrow exceptions whereby disclosure of records and communications without consent is permitted. See 740 ILCS 110/5 to 12.3 (West 2014).

¶ 21    As our supreme court has summarized:

"The Act represents a comprehensive revision and repeal of previous statutes pertaining to psychotherapeutic communications. [Citation.] When viewed as a whole, the Act constitutes a strong statement by the General Assembly about the importance of keeping mental-health records confidential. [Citation.] Confidentiality motivates persons to seek needed treatment. Further, by encouraging complete candor between patient and therapist, confidentiality is essential to the treatment process itself. [Citation.]

The legislature carefully drafted the Act to maintain the confidentiality of mental-health records except in the specific circumstances explicitly enumerated. In each case where disclosure is allowed under the Act, the legislature has been careful to restrict disclosure to that which is necessary to accomplish a particular purpose. Exceptions to the Act are narrowly crafted. [Citation.] 'Consequently, anyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act.' [Citation.]" *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 60 (2002).

¶ 22    The parties here, including plaintiff, do not dispute that John Doe was a "recipient" of "mental health or developmental disabilities services" while a resident at Renaissance. Nor could they realistically do so. Even without considering the partially redacted records submitted for our *in camera* review, we note that the IDPH investigation revealed that John Doe had been diagnosed with Alzheimer's disease and was described as being "severely demented" while a resident at Renaissance. That report also indicated that John Doe and Mr. Holman were roommates at Renaissance, and defense counsel indicated to the circuit court below that both Mr. Holman and John Doe were residents of Renaissance's dementia unit. None of these factual assertions have ever been disputed.

¶ 23    Moreover, the definition of "mental health or developmental disabilities services" or "services" contained in the Confidentially Act is very broad, as it "includes but is not limited to examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation." 740 ILCS 110/2 (West 2014). Certainly, the long-term care John Doe, a severely demented person who had been diagnosed with Alzheimer's disease, received while a resident of Renaissance's dementia unit qualified as, at least, "treatment" or "aftercare, habilitation or rehabilitation." *Id*. Even if it did not, as the statutory definition is not limited to the itemized services contained therein and in light of the fact that the Confidentiality Act "constitutes a strong statement by the General Assembly about the importance of keeping mental-health records confidential" (*Reda*, 199 Ill. 2d at 60), we would conclude the long-term care John Doe received at Renaissance qualified as "mental health or developmental disabilities services." In addition, our own review of the partially redacted records submitted for *in camera* inspection does nothing to dissuade us from concluding that John Doe was in fact a "recipient" of "mental health or developmental disabilities services" at Renaissance.

¶ 24    What the parties do dispute is whether the records the circuit court actually ordered to be disclosed constituted "records" or "communications" under the Confidentiality Act. We conclude that they clearly do. Again, the Confidentiality Act defines records to include "*any record* kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient concerning the recipient and the services provided," and communications are defined to include "*any communication* made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient. Communication includes information which indicates that a person is a recipient." (Emphases added.) 740 ILCS 110/2 (West 2014).

¶ 25    Our review of the records provided for *in camera* inspection reveals that those documents fall comfortably within these very broad definitions. All the documents–including patient information forms, nurse's notes, evaluations, care plans, and social service progress notes, even in their partially redacted form–concern John Doe and the services he was provided while a resident at Renaissance. Indeed, our review of these documents reveals that they were all apparently prepared by a nurse or a social worker at Renaissance, individuals qualifying as a "therapist" under the Confidentiality Act. *Id*. Without further elucidating the contents of those records, and even in their partially redacted form, those records also include information regarding a number of conversations and other statements to and from "therapists" regarding John Doe and the "services" he received while at Renaissance.[3]

¶ 26    In coming to an opposite conclusion, both the circuit court and plaintiff rely upon this court's decision in *Giangiulio v. Ingalls Memorial Hospital*, 365 Ill. App. 3d 823 (2006). Similarly to this case, the plaintiff there was attacked with a knife by another patient during her stay at a hospital and she sued the hospital for its negligence in failing to prevent the attack. *Id*. at 826. While the unnamed attacker was not named a defendant, plaintiff nevertheless sought to obtain information from the hospital regarding that attacker, as well as the knife used in the attack. *Id*. at 826-28. On appeal from the defendant's refusal to provide a response to these discovery requests, this court concluded that the Confidentiality Act did not preclude the

---

[3]We are careful not to reveal too much information regarding the content of these records, in order to preserve the parties' ability to file an appeal from our decision.

defendant hospital from providing plaintiff with the knife or "information regarding the doctors, nurses, staff, and employees with whom [the attacker] had contact. Because [plaintiff] is suing the hospital, its employees and staff for their negligence in allowing her to be attacked while a patient, no information about Jane Doe's medical or mental condition is required when answering those interrogatories." *Id.* at 838.[4]

¶ 27    We do not find this decision to be supportive of the circuit court's decision to disclose the partially redacted records in this matter, on the basis that they did not constitute records or communications. Specifically, the *Giangiulio* decision did not authorize the hospital's disclosure of actual records or communications under the Confidentiality Act, it merely reasoned that the hospital was permitted to provide written answers to interrogatories and to provide a physical object, the knife used in the attack. Moreover, the information that the hospital was required to provide was limited to information regarding staff members at the hospital who had contact with the attacker, with this court specifically concluding that "no information about Jane Doe's medical or mental condition is required when answering those interrogatories." *Id.* This is simply not the situation presented here, where the circuit court required disclosure of actual records and communications which contained specific information regarding John Doe and his condition, behavior, and treatment.

¶ 28    Our conclusion that the documents the circuit court required Renaissance to disclose constituted records and communications under the Confidentially Act thus brings them under the broad, general statutory provision that "[a]ll records and communications shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/3(a) (West 2014). And as we already indicated, while there are exceptions to this protection, the limited statutory "[e]xceptions to the Act are narrowly crafted. [Citation.] 'Consequently, anyone seeking the nonconsensual release of mental health information faces a formidable challenge and *must show* that disclosure is authorized by the Act.' [Citation.]" (Emphasis added.) *Reda*, 199 Ill. 2d at 60. Thus, in this matter it was *plaintiff's* burden to demonstrate that some exception to the Confidentiality Act authorized disclosure in this matter.

¶ 29    However, the record reveals that plaintiff never asserted the applicability of any statutory exception below, focusing solely upon her incorrect argument that the Confidentiality Act was simply "inapplicable to the requested nursing home records." For that reason, the trial court was not required to make any findings or rulings with respect to the applicability of any of the exceptions to the Confidentiality Act. And on appeal, plaintiff initially responded to Renaissance's argument that the Confidentiality Act barred disclosure in this matter by stating "the trial court did not base its ruling on any exception to the Confidentiality Act and plaintiff did not and is not claiming a right to disclosure pursuant to any of the exceptions." It was not until she filed her answer to the petition for rehearing that plaintiff made any assertion that any exception to the Confidentiality Act applied here.

¶ 30    In sum, the record reflects that Renaissance established below that the documents the circuit court required it to disclose were confidential and not generally subject to disclosure under the Confidentially Act, plaintiff failed to make any attempt to demonstrate that any exception to the Confidentiality Act authorized disclosure below, and as a result the circuit

---

[4]For the reasons we discuss below, the *Giangiulio* decision also fails to support plaintiff's position or the trial court's discovery orders in that it did not–indeed, it had no need to–address any of the exceptions to the Confidentiality Act.

court conducted no specific analysis and made no specific findings with respect to any possible exception to the protection offered by the Confidentiality Act. Moreover, with plaintiff having failed to raise any possible exception to the Confidentially Act below having initially and specifically disclaimed any reliance upon any such exception on appeal, it would be improper for us to address the applicability of any possible exception for the first time on appeal. See *In re E.F.*, 2014 IL App (3d) 130814, ¶ 42 ("the failure to raise an issue in the trial court results in forfeiture of that issue on appeal"); Ill. S. Ct. R. 341(h)(7), (i) (eff. Feb. 6, 2013) (noting that points not argued in an appellee's brief are waived, and "shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). Under these particular circumstances, and with plaintiff having made no showing that any exception to the Confidentiality Act applies, we conclude that the trial court's discovery orders were improper.

¶ 31　　On appeal, Renaissance alternatively contends that the records required to be disclosed by the circuit court were also protected by the physician-patient privilege. 735 ILCS 5/8-802 (West 2014). However, our conclusion that the Confidentiality Act protects those records from disclosure and the fact that plaintiff made no showing that any exception to the Confidentiality Act applies renders this alternative argument irrelevant.

¶ 32　　As the statutory language of the physician-patient privilege provides that "[i]n the event of a conflict between the application of this Section and the Mental Health and Developmental Disabilities Confidentiality Act to a specific situation, the provisions of the Mental Health and Developmental Disabilities Confidentiality Act shall control." *Id.* Thus, the statutory language provides that the provisions of the Confidentiality Act must control our decision in this matter, regardless of whether or not disclosure would be barred by the physician-patient privilege under the circumstances here.

¶ 33　　Finally, it is well recognized that if a discovery order is improper, any finding of contempt for the failure to comply with that order must be reversed. *Klaine v. Southern Illinois Hospital Services*, 2014 IL App (5th) 130356, ¶ 9. We therefore reverse and vacate the circuit court's order finding defense counsel in contempt and imposing a $100 fine for defense counsel's refusal to comply with the improper discovery orders.

¶ 34　　　　　　　　　　　　　III. CONCLUSION

¶ 35　　For the foregoing reasons, we reverse the circuit court's discovery orders, vacate its order finding defense counsel in contempt and imposing upon defense counsel a $100 fine, and remand for further proceedings consistent with this order.

¶ 36　　Reversed and remanded. Contempt order vacated.