NO. 4-06-0332          Filed 5/4/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

REGENCY COMMERCIAL ASSOCIATES, LLC, an ) Appeal from
Indiana Limited Liability Company,        ) Circuit Court of
      Plaintiff-Appellee,                  ) Champaign County
      v.                                   ) No. 05CH93
LOPAX, INC., a Delaware Corporation,      )
      Defendant-Appellant.                 ) Honorable
                                           ) Heidi Ladd,
                                           ) Judge Presiding.
_____

JUSTICE KNECHT delivered the opinion of the court:

Due to its desire to lease land to Pictor Enterprises, III, Inc. (Pictor), a company planning to open a Buffalo Wild Wings restaurant, plaintiff, Regency Commercial Associates, Ltd. (Regency), filed a complaint for declaratory judgment concerning a restrictive covenant in a land sales contract in favor of defendant, Lopax, Inc. (Lopax), on land previously sold to Lopax by Regency's predecessor for use as a Kentucky Fried Chicken (KFC) restaurant. Pursuant to Regency's motion for summary judgment, the trial court determined the restriction covered "fast[-]food" restaurants primarily serving chicken and also found an evidentiary hearing would be necessary to determine if Buffalo Wild Wings was a fast-food restaurant. Prior to the evidentiary hearing, Lopax filed a motion for summary judgment contending Regency entered into a lease with Pictor prior to filing its complaint for declaratory judgment and was barred from

obtaining declaratory relief by the doctrine of "non[]liability for past conduct."  The court ruled Regency was not barred by the doctrine and denied Lopax's motion for summary judgment.  After an evidentiary hearing, the court found Buffalo Wild Wings was not a fast-food restaurant and, hence, was not covered by the restrictive covenant.  Lopax appeals the court's decisions (1) the restrictive covenant covered only fast-food restaurants serving primarily chicken, (2) the declaratory-judgment action was not barred by the doctrine of nonliability for past conduct, and (3) Regency need not be compelled to produce the entire lease agreement between itself and Pictor.  We affirm.

## I. BACKGROUND

On June 20, 2001, Lopax entered into a contract with Arbours Development Limited Partnership (Arbours) to purchase a parcel of land in Savoy in order to lease it to Bartlett Management Services, Inc., for the operation of a KFC restaurant.  The contract included a restrictive covenant negotiated between the parties prohibiting Arbours from permitting certain types of competitive restaurant operations within its commercial development area.  The restriction was memorialized in paragraph 4.1(h) of the contract and reads in pertinent part as follows:

> "Seller will not after the date of this
> agreement sell, lease[,] or permit to be
> occupied any real estate which [s]eller owns,
> manages[,] or otherwise controls within one
> mile of the [l]and for the purpose of con-

structing, or having conducted thereon, any fast[-]food [(quick service restaurant)] restaurant or restaurant facility whose principal food product is chicken on the bone, boneless chicken[,] or chicken sandwiches. The prohibited businesses would include but be not limited to Boston Market, Popeye's Chicken, Church's Fried Chicken[,] and Pirtles Chicken. Other than the aforementioned restaurants which shall absolutely be prohibited, a restaurant shall be deemed to 'feature boneless chicken or chicken sandwiches' only if the primary business of such restaurant is the sale of such items. This provision shall survive the [c]losing and shall not be merged into the [d]eed. Seller may sell, lease[,] or permit the occupancy of any such real estate by (1) dinner houses or seafood restaurants, (2) Oriental, French, Mexican, Italian[,] or other ethnic restaurants, (3) any so-called 'casual dining' restaurant such as Chili's or Black-Eyed Pea, or (4) any food speciality shops such as ice cream, yogurt, pizza[,] or similar single[-]item shops."

Regency later purchased Arbours' rights under the contract.

Sometime in February 2005, Regency's attorney contacted Lopax's attorney in an attempt to obtain permission to lease a portion of its restricted land for the operation of a Buffalo Wild Wings restaurant. On February 23, 2005, Lopax's attorney sent a written objection based on the restrictions in paragraph 4.1(h) of the contract and Lopax's position that Buffalo Wild Wings is a restaurant facility whose principal food product is chicken. On March 7, 2005 Regency's attorney again contacted Lopax's attorney in an effort to convince Lopax to withdraw its written objection to the leasing of the property for a Buffalo Wild Wings restaurant because it is a full service "casual dining" restaurant expressly permitted under paragraph 4.1(h) and not a fast-food restaurant. On March 8, 2005, Lopax's attorney responded Lopax was not withdrawing its objection due to its interpretation of the restrictive covenant as generally prohibiting restaurant facilities whose primary food product is chicken and not just fast-food restaurants. On March 16, 2005, Daniel Pictor, the Buffalo Wild Wings franchisee, contacted Lopax and offered $5,000 for permission to locate in the restricted area.

On March 29, 2005, Regency filed a verified complaint for declaratory judgment asking the trial court to find (1) the restriction found in paragraph 4.1(h) prohibits fast-food restaurant operations serving primarily chicken but does not prohibit other types of restaurant operations whose primary food product is chicken and (2) Buffalo Wild Wings is not a fast-food restaurant but a full-service restaurant featuring "casual dining."

- 4 -

On May 2, 2005, Lopax filed a motion to dismiss under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2002)) and attached exhibits in support of its contention that Buffalo Wild Wings is a restaurant whose principal food product is chicken and paragraph 4.1(h) was unambiguous in its prohibition of both (1) fast-food restaurants whose principal food product is chicken or (2) restaurant facilities whose principal food product is chicken.

On June 29, 2005, Regency filed both a response to Lopax's motion to dismiss and a motion for summary judgment with attached exhibits in support of its contention that paragraph 4.1(h) unambiguously prohibits only restaurants and restaurant facilities that are both fast food and whose primary food product is chicken.

On July 27, 2005, the trial court heard arguments on both parties' motions. After taking the matter under advisement, on September 7, 2005, the court determined, first, the language of paragraph 4.1(h) was ambiguous, and second, after reviewing the exhibits pertaining to correspondence between the parties during negotiations of the final contract and the circumstances under which agreement on the final terms were reached, the contract language prohibits fast-food restaurants whose principal food product is chicken and fast-food restaurant facilities whose principal food product is chicken. Further, the court determined a genuine factual dispute remained as to whether Buffalo Wild Wings fit the description of either a fast-food restaurant or

- 5 -

fast-food restaurant facility whose principal product is chicken. Thus, the court denied Lopax's motion to dismiss and granted part of Regency's motion for summary judgment.

On September 29, 2005, Lopax filed a motion to reconsider, which was denied on October 27, 2005. On November 10, 2005, Daniel Pictor, the Buffalo Wild Wings franchisee, contacted Mike Bartlett, a minority shareholder of Lopax and manager of the KFC at issue, and offered to negotiate with Lopax to settle this dispute just to speed things up as he was confident Regency would prevail in court. However, he also stated he already signed a lease with Regency. After Lopax learned an actual lease between Regency and Pictor existed, it determined the lease existed prior to Regency filing its complaint for declaratory judgment.

On January 20, 2006, Lopax filed a motion to compel discovery of the entire lease between Regency and Pictor and a motion for summary judgment based on the theory of nonliability for past conduct. In response to the motion to compel, Regency produced 8 paragraphs of the lease agreement and, later, the table of contents of the lease indicating it contained 67 pages, including exhibits and riders. The paragraphs produced by Regency pertained to basic lease information such as date signed, location of property, term, permitted uses, commencement date (which was defined as the date on which this lawsuit is resolved), and a "[c]ontingency [c]lause" relating commencement of the lease term to successful resolution of this lawsuit.

On March 3, 2006, a hearing was held on Lopax's motion

for summary judgment and motion to compel discovery. Lopax's theory was a lease existed between Regency and Pictor for the operation of a Buffalo Wild Wings restaurant prior to Regency filing its complaint for declaratory judgment and, because it had already taken action that either was or might be in violation of the provision of the contract between Lopax and Regency that was the subject of the declaratory-judgment action, it was barred from seeking such relief because it was seeking a finding of non-liability for action already taken and a declaration of its rights if it took some future action. The trial court denied Lopax's motion for summary judgment because Regency's lease agreement with Pictor was contingent on the outcome of this declaratory-judgment action. The court then stated the only issue not resolved was whether Buffalo Wild Wings was a fast-food restaurant. Regency produced the entire lease agreement for the court's in camera inspection.

On March 13, 2006, the trial court determined, after an in camera inspection, the remaining portions of the lease agreement contained nothing that would be relevant to a determination of the remaining issue of whether Buffalo Wild Wings was a fast-food restaurant and denied Lopax's motion to compel its discovery.

On March 23 and 24, 2006, a bench trial was held on the remaining issue of fact, and the trial court found Buffalo Wild Wings was not a fast-food restaurant. Judgment was entered in favor of Regency. This appeal followed.

- 7 -

II. ANALYSIS

A. Interpretation of Restrictive Covenant

At issue is the prohibition against "any fast[-]food (QSR) restaurant or restaurant facility whose principal food product is chicken on the bone, boneless chicken[,] or chicken sandwiches."  (The term "QSR" in the contract is explained in the record as the restaurant industry's new description of fast-food restaurants and means "quick serve restaurant."  It has no bearing on the interpretation of the contract.)  Regency asserts the quoted language was intended to prohibit (1) fast-food restaurants whose principal product is chicken and (2) fast-food restaurant facilities whose principal product is chicken.  Lopax asserts this language was intended to prohibit (1) fast-food restaurants serving primarily chicken and (2) restaurant facilities serving primarily chicken.

When construing the language of a contract, a court's principal objective is to give effect to the intent the parties possessed at the time they entered into the agreement.  First Bank & Trust Co. v. Village of Orland Hills, 338 Ill. App. 3d 35, 40, 787 N.E.2d 300, 304 (2003).  The agreement is to be interpreted as a whole, giving meaning and effect to every provision when possible, and a court will not interpret the agreement in a way that would nullify provisions or render them meaningless.  Coles-Moultrie Electric Cooperative v. City of Sullivan, 304 Ill. App. 3d 153, 159, 709 N.E.2d 249, 253 (1999).  When parties agree to and insert language into a contract, the presumption is it was

- 8 -

done purposefully and the language employed is to be given effect. Coles-Moultrie Electric, 304 Ill. App. 3d at 159, 709 N.E.2d at 253.

If the terms of a contract are unambiguous, the parties' intent is ascertained solely from the words of the contract itself. Bradley Real Estate Trust v. Dolan Associates Ltd., 266 Ill. App. 3d 709, 712, 640 N.E.2d 9, 11 (1994). The question whether the language of a contract is ambiguous and requires additional evidence for interpretation is a question of law. River's Edge Homeowners' Ass'n v. City of Naperville, 353 Ill. App. 3d 874, 878, 819 N.E.2d 806, 809-10 (2004).

Where an ambiguity exists, parol or extrinsic evidence may be considered to interpret the contract. Abingdon Bank & Trust Co. V. Bulkeley, 390 Ill. 582, 592, 62 N.E.2d 447, 451 (1945). As part of the parol evidence, a court may consider preliminary negotiations between the parties in order to determine the meaning of contract provisions and the intent of the parties. Rybicki v. Anesthesia & Analgesia Associates, Ltd., 246 Ill. App. 3d 290, 299, 615 N.E.2d 1236, 1242-43 (1993).

A court's determination of the construction of a contract is a question of law. People ex rel. Department of Public Health v. Wiley, 218 Ill. 2d 207, 223, 843 N.E.2d 259, 268 (2006). Construction of contractual language is subject to de novo review. American States Insurance Co. v. Koloms, 177 Ill. 2d 473, 479-80, 687 N.E.2d 72, 75 (1997).

The trial court considered the language of the contract

- 9 -

to be ambiguous. Consequently, the court then looked at the written exchanges between the parties while negotiating the contract and the memorandum of contract to purchase recorded April 17, 2002, and the amended memorandum recorded August 8, 2002, and signed by both parties, as well as the language of the contract, in determining that the contract language prohibited fast-food restaurants whose principal product is chicken and fast-food restaurant facilities whose principal product is chicken.

Both parties first contend the provision at issue is not ambiguous. Lopax contends the use of "or" to connect phrases "fast[-]food (QSR) restaurant" and "restaurant facility" repre- sents two alternatives intended to be different or unlike each other: either fast-food (QSR) restaurants serving chicken or restaurant facilities serving chicken. Regency presented an affidavit in opposition to Lopax's section 2-619 motion to dismiss the complaint for declaratory judgment in which the affiant, James R. McKinney, the president of Regency, suggests the term "restaurant" means a stand-alone facility while "restau- rant facility" means an operation found in a multioutlet food court, embedded in a store or otherwise not a stand-alone facil- ity. The trial court found this distinction persuasive when finding Lopax's interpretation of the contract language would make the word "facility" surplusage while Regency's definition would not. Lopax contends the "or" must have been inserted to differentiate between fast-food and not-fast-food restaurant

operations and differentiate between restaurants and restaurant facilities because those terms are used interchangeably in the contract in reference to its own KFC operation.

Lopax notes every provision in a contract must be given effect (see <u>Martindell v. Lake Shore National Bank</u>, 15 Ill. 2d 272, 283, 154 N.E.2d 683, 689 (1958)) and contends its interpretation focusing on whether a restaurant serves primarily chicken and not the type of service given by the restaurant (fast food or full service) was the intent of the parties' prohibition. Lopax specifically notes the language in paragraph 4.1(h): "Other than the aforementioned restaurants which shall absolutely be prohibited, a restaurant shall be deemed to 'feature boneless chicken or chicken sandwiches' only if the primary business of such restaurant is the sale of such items." Lopax contends this language creates a strict prohibition on restaurants serving primarily chicken, regardless of level of service. Lopax contends this phrase is placed before the second half of the restrictive clause and indicates the parties will determine if a restaurant which would otherwise have been permitted will be restricted, because in a category listed in the second half of the clause, based on its service of primarily chicken.

Regency contends the distinction between "restaurant" and "restaurant facility" is important under contract-interpretation principles that require every word to be given meaning and not be considered surplusage. Regency contends the inclusion of specific prohibited and permissible restaurants is inconsistent

- 11 -

with Lopax's "or" interpretation of the sentence. All examples given of prohibited restaurants are fast-food restaurants that serve primarily chicken. Thus, the intent of the contract is to prohibit operations that are both "fast food" and "serve primarily chicken." Permitted restaurants listed are casual dining, dinner houses, ethnic restaurants, fine dining, et cetera. These examples listed are not fast-food but are full-service restaurants indicating an intent for the distinguishing characteristic to be the level of service and the serving of chicken. Thus, the intent was to prohibit only fast-food restaurants and fast-food restaurant facilities serving primarily chicken.

Lopax contends service level is not the primary focus of the restrictive clause because it intended to limit chicken restaurants regardless of service level. Further, Lopax argues, if the chicken restriction is interpreted as Regency suggests, there is no need for the "test" language and the court must ignore two of the four sentences in 4.1(h) that limit use. By interpreting the contract as "fast food" modifying both "restaurant" and "restaurant facility," the restriction only applies to fast-food chicken operations. Therefore, the parties would not need to explain the ban on fast-food chicken operations as it is obvious. However, if the language creates a test for determining if a restaurant facility primarily serves chicken, then all language in the clause becomes relevant.

We note Lopax argues it intended to prohibit all restaurants serving primarily chicken as that would certainly be

more beneficial to it but it is not clear from the language of the clause at issue the restriction was that comprehensive. We find, as the trial court did, the language at issue is ambiguous, and we also look to parol and extrinsic evidence.

Evidence from negotiations showed Lopax's concern regarding competition from restaurant operations serving chicken as it attempted to insert specific language referring to competition with KFC. It also suggested the restrictive language contain a quantitative measure of 5% of gross sales revenue from chicken putting a restaurant into the restricted category. Regency attempted to limit the restrictive language to "fast[-]food" restaurants only, but none of these provisions appear in the final contract. Lopax repeatedly tried to control the type of food served and not the level of service as it rejected Regency's attempt to insert the words "fast[-]food" in the clause "Other than the aforementioned restaurants which shall absolutely be prohibited, a fast[-]food restaurant shall be deemed to 'feature boneless chicken or chicken sandwiches' only if the primary business of such restaurant is the sale of such items." (Emphasis in original.) Indeed, Lopax's concern consistently was not over the level of service but the serving of chicken.

Further negotiation evidence indicates Regency's rejection of Lopax's attempts to prohibit all fast-food restaurants, not just those serving primarily chicken. Regency rejected Lopax's inclusions of Burger King, McDonald's, Steak 'N Shake, Backyard Burger, Hardee's, Wendy's, and Arby's in examples

- 13 -

of specifically prohibited restaurants.  Regency also crossed out language prohibiting "any fast[-]food restaurant or restaurant facility featuring chicken on the bone, boneless chicken[,] or chicken sandwiches."  Instead, Regency added the language "whose principal food product is chicken on the bone, boneless chicken[,] or chicken sandwiches" following the description of prohibited operations as any "fast[-]food restaurant or restaurant facility."

Regency's crossing-out of the language "featuring chicken" is instructive as it leaves meaningless the language defining "featuring chicken" relied upon by Lopax in its argument the parties meant this language as a "test."  The definition language was left in the contract while the term it is attempting to define was removed.  Thus, it is not a "test" at all and has no bearing on the correct interpretation of the prohibited restaurant operations.

Lopax argues actions of Regency after the contract demonstrate Regency knew the chicken restriction applied to Buffalo Wild Wings.  The record indicates on February 23, 2005, Regency's attorney contacted Lopax's attorney in an attempt to obtain permission to lease a portion of the restricted area to Pictor for the operation of a Buffalo Wild Wings restaurant.  Regency's attorney again contacted Lopax's attorney in an effort to convince Lopax to remove its written objection to such a lease.  On March 16, 2005, Daniel Pictor, the Buffalo Wild Wings franchisee, contacted Lopax and offered $5,000 for permission to

locate in the restricted area. These actions are not indicative of a contract interpretation by Regency but of attempts to avoid litigation because the contract language was arguably ambiguous.

Further evidence of the parties' intent is found in the memorandum and amended memorandum recorded by the Champaign County recorder of deeds. The memoranda were recorded in Champaign County after the sale of the KFC premises in order to give notice of the chicken competition restriction. The memorandum was originally recorded on April 7, 2002, and amended on August 6, 2002. After notice by recordation, interested parties have a duty to investigate any noted restrictions or be deemed to have actual notice of the facts. Smith v. Grubb, 402 Ill. 451, 464, 84 N.E.2d 421, 428 (1949). Recording of documents serves to notify any interested parties in the future of the status of owners of property and/or restrictions on specific parcels. Housing Authority of Gallatin County v. Church of God, 401 Ill. 100, 108, 81 N.E.2d 500, 505 (1948).

The memorandum of contract to purchase recorded April 17, 2002, and the amended memorandum recorded August 6, 2002, support the trial court's construction of the disputed language. Both were signed by representatives for Regency and Lopax, including Lopax's attorney, who negotiated the contract. The memorandum recorded April 17 states:

> "[N]o fast[-]food restaurant shall be allowed
> on the [a]dditional [r]eal [e]state currently
> owned by [s]eller whose principal food prod-

- 15 -

uct is <u>chicken</u> <u>on</u> <u>the</u> <u>bone,</u> <u>boneless</u> <u>chicken</u>

<u>or</u> <u>chicken</u> <u>sandwiches</u>."  (Emphases added.)

The language in the amended memorandum recorded August 6, 2002, states:

"[N]o <u>fast[-]food</u> <u>restaurant</u> <u>shall</u> <u>be</u> <u>allowed</u>

on the [a]dditional [r]eal [e]state or any

other real estate which [s]eller or Arbours

Development Limited Partnership owns, man-

ages[,] or otherwise controls within one (1)

mile of the [r]eal [e]state, <u>whose</u> <u>principal</u>

<u>food</u> <u>product</u> <u>is</u> <u>chicken</u> <u>on</u> <u>the</u> <u>bone,</u> <u>boneless</u>

<u>chicken[,]</u> <u>or</u> <u>chicken</u> <u>sandwiches</u>."  (Emphases

added.)

The wording of the amended memorandum includes the same examples of permissible restaurants as are included in the contract itself:  "(1) dinner houses or seafood restaurants, (2) Oriental, French, Mexican, Italian[,] or other ethnic restaurants, (3) any so-called 'casual dining' restaurant such as Chili's or Black-Eyed Pea, or (4) any food specialty shops such as ice cream, yogurt, pizza[,] or similar single[-]item shops."  The wording of both memoranda can only be read to apply to "fast[-]food" restaurants whose "principal food product is chicken."  This is strong evidence the intent of the contract was to prohibit only fast-food restaurants whose primary food product is chicken and to allow casual dining restaurants no matter their primary food product.  Both parties agreed to the language of the postcontract

memoranda.

Obviously, Lopax, as the operator of the KFC restaurant, wanted to obtain a restriction against competition that was as broad as possible. On the other hand, Regency's predecessor, Arbours, as the owner of commercial property surrounding KFC's operation, wanted to limit the restriction as much as possible. Given the evidence of the contract negotiations, it is clear neither party got everything it wanted in the final contract. However, as the memorandum and amended memorandum of contract indicate, the final contract included a prohibition against fast-food restaurant operations serving primarily chicken, the logical direct competitors to a KFC restaurant, which both parties agree is a fast-food restaurant operation. The trial court was correct in its interpretation of the contract language, its denial of Lopax's section 2-619 motion to dismiss, and the partial grant of Regency's motion for summary judgment.

### B. Applicability of Doctrine of NonLiability for Past Conduct

The principle of "nonliability for past conduct" means a party cannot seek declaratory relief to excuse itself from liability incurred after acting in a way that would affect contractual rights. Howlett v. Scott, 69 Ill. 2d 135, 143, 370 N.E.2d 1036, 1039 (1977); Delano Law Offices, P.C. v. Choi, 154 Ill. App. 3d 172, 173, 506 N.E.2d 723, 724 (1987).

Lopax asserts the contract between it and Regency prohibits Regency from leasing to restaurants whose primary food

product is chicken. However, by entering into a lease with Pictor for the operation of a Buffalo Wild Wings restaurant prior to the filing of this complaint, Regency has taken action prohibited by contract. The "nonliability for past conduct" principle prohibits Regency from seeking declaratory relief under the declaratory-judgment statute because the court cannot declare Regency not liable for action already taken.

During pretrial discovery, Lopax filed a motion for summary judgment raising the defense of the "doctrine of nonliability for past conduct." The doctrine was not raised as an affirmative defense in any Lopax pleading. Regency contends the denial of Lopax's motion for summary judgment is not reviewable on appeal and Lopax has waived the issue of nonliability for past conduct as it did not plead this defense and did not attempt to introduce evidence on the issue at trial.

Denial of a motion for summary judgment is not immediately appealable because it is an interlocutory order. In re Estate of Funk, 221 Ill. 2d 30, 85, 849 N.E.2d 366, 397 (2006). Generally, denial of summary judgment is not reviewable after trial on the merits because the result of any error is merged into the judgment entered at trial. Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 199 Ill. 2d 325, 355, 770 N.E.2d 177, 196 (2002). However, where a summary-judgment motion presented a legal issue rather than a factual one, review of the denial of summary judgment is appropriate. Battles v. La Salle National Bank, 240 Ill. App. 3d 550, 558, 608 N.E.2d 438, 444

(1992) (First District) (summary-judgment denial not merged because trial did not deal with legal issue raised in motion for summary judgment).

In Funk, after denial of the motion for summary judgment, the trial court proceeded to resolve the case and the issue first raised by the motion for summary judgment, based on all evidence that was presented at trial. Thus, any error in denial of the motion for summary judgment merged into the final judgment. Funk, 221 Ill. 2d at 85, 849 N.E.2d at 397. However, in this case, the trial court did not resolve the same issue after denial of summary judgment but held a completely separate hearing with evidence on a completely separate issue before resolving the case and entering final judgment.

Further, at hearing, Lopax attempted to question Daniel Pictor regarding the existence of the lease between Regency and Pictor. This line of questioning was met with four relevance objections from Regency, all sustained. When Lopax started to assert it wanted to make an offer of proof, the trial court told Lopax it was unnecessary due to the established pretrial record. In addition, when its motion for summary judgment was denied, Lopax requested permission to seek an interlocutory appeal but counsel for Regency objected, saying, "This issue [(nonliability)] can be appealed with the entire case, if appropriate, in less than thirty days." Thus, Regency's actions both before and during trial contradict its position here. Lopax was prevented from offering any evidence at trial by Regency, and

Regency objected to an interlocutory appeal. Regency cannot now take a different position and assert Lopax has forfeited this issue. It is disingenuous for Regency to argue no evidence was presented at trial in light of its conduct at trial. The principles of forfeiture do not permit a party to complain of error that produces forfeiture, where to do so is inconsistent with the party's position in an earlier court proceeding. See Belleville Toyota, 199 Ill. 2d at 333, 770 N.E.2d at 184.

Thus, we consider Lopax's argument Regency's complaint for declaratory judgment is barred by the doctrine of nonliability for past conduct. The standard of review for a decision on a summary-judgment motion is de novo. Truserv Corp. v. Bess Hardware & Sports, Inc., 346 Ill. App. 3d 194, 198, 804 N.E.2d 611, 614 (2004).

Lopax contends it is hampered in its arguments on this issue because Regency has never produced the entire agreement between it and Pictor, only excerpts. However, these facts are clear: Regency entered into agreement with Pictor on March 24, 2005, and filed suit on March 29, 2005. Regency denies the existence of a lease due to contingencies within the agreement.

For a lease to be valid in Illinois "there must be agreement as to the extent and bounds of the property, the rental price and time and manner of payment, and the term of the lease." Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc., 114 Ill. 2d 133, 145, 500 N.E.2d 1, 6 (1986). In this case, portions of the agreement produced by Regency satisfy some of these require-

ments. Paragraph 1.B specifies "extent and bounds of the property." Paragraph 1.G specifies a term of 10 years with two options to renew. Lopax further argues it must be presumed some of the agreement's clauses must provide for "rental price and manner of payment."

Regency points to a contingency in the agreement found in section 33.34 of the lease rider. This contingency states:

"Parties acknowledge that at the time this [l]ease was executed [l]andlord was a party to a lawsuit with Lopax, Inc., regarding the permissibility of [t]enant's [p]ermitted use. This [l]ease shall be contingent upon said lawsuit having been fully resolved. Upon successful resolution of the lawsuit [l]andlord shall send a [c]ommencement [d]ate [a]greement which shall be executed by both [l]andlord and [t]enant and thereafter parties shall diligently pursue to complete its obligations of the [l]ease."

Lopax contends this contingency is irrelevant to the existence of a lease. Express conditions precedent in contracts that affect a party's performance are subject to rules of strict compliance. M X L Industries, Inc. v. Mulder, 252 Ill. App. 3d 18, 26, 623 N.E.2d 369, 375 (1993) (Second District). A condition precedent is defined as "one which must be performed either before a contract becomes effective or which is to be performed

- 21 -

by one party to an existing contract before the other party is obligated to perform." M X L Industries, 252 Ill. App. 3d at 25, 623 N.E.2d at 374. Lopax argues as a condition precedent the language of the "contingency" must be strictly construed. Since the lease was signed on March 24, 2005, prior to this lawsuit on March 29, the express condition precedent is invalid because no lawsuit existed at the time the lease was signed.

Alternatively, Lopax asserts a performance contingency does not prevent creation of a valid contract. See Catholic Charities of the Archdiocese of Chicago v. Thorpe, 318 Ill. App. 3d 304, 307, 741 N.E.2d 651, 653 (2000). "Whether an act is necessary to formation of the contract or the performance of an obligation under the contract depends on the facts of the case." McAnelly v. Graves, 126 Ill. App. 3d 528, 532, 467 N.E.2d 377, 379 (1984). If "a condition goes solely to the obligation of the parties to perform, existence of such a condition does not prevent the formation of a valid contract." McAnelly, 126 Ill. App. 3d at 532, 467 N.E.2d at 379. The factual analysis hinges on the mutual assent of the parties; if they agree to formation of a binding contract, agreed-on conditions only affect the duty to perform and the contract is valid. Catholic Charities, 318 Ill. App. 3d at 307-08, 741 N.E.2d at 653, quoting Edmund J. Flynn Co. v. Schlosser, 265 A.2d 599, 601 (D.C. 1970).

Lopax contends Regency and Pictor mutually assented to lease the land and memorialized the same, including all the terms necessary to form a valid lease. The lease's contingency lan-

guage makes Regency's duty to perform subject to the outcome of this case. The condition concerns Regency's obligation to permit Pictor to occupy the premises and does not concern any of the factors required to determine the existence of a lease. Lopax argues even if the contingency occurs and Regency's performance is excused, a lease still exists under Illinois law before any performance can be excused.

Lopax contends this case is analogous to McAnelly. The McAnelly case dealt with a contract contingency of obtaining necessary permits within 24 months which, if not obtained, would make the lease of no effect. The court stated there was a valid lease because neither party had the privilege of revocation prior to the 24-month period ending and no further expression of assent by the parties was necessary to proceed with the lease. See McAnelly, 126 Ill. App. 3d at 533, 467 N.E.2d at 379. Further, by Regency's reliance on the contingency, it is confirming the validity of the lease. See McAnelly, 126 Ill. App. 3d at 534, 467 N.E.2d at 380 (court found the defendants affirmed the validity of the lease by invoking the provision for termination of the lease). Lopax argues Regency cannot simply abandon the lease without Pictor's permission and, therefore, entered into a binding contract that irrevocably changed its position and cannot now seek to have this court declare it not liable for its past conduct.

Lopax's argument is essentially a lease existed prior to the filing of this cause of action, and thus, this action is

- 23 -

barred by the existence of the lease.  However, it is clear the parties agree this suit is the one referred to in the lease agreement and the fact it was filed a few days after the apparent execution of the lease agreement is not dispositive of the issue of whether Regency can pursue a declaratory-judgment action.

The purpose of the declaratory-judgment statute is for a court to offer guidance to parties in relation to future conduct in order to avoid or lessen potential liability.  Adkins Energy, LLC v. Delta-T Corp., 347 Ill. App. 3d 373, 378, 806 N.E.2d 1273, 1277-78 (2004).  A declaratory judgment is designed to settle and fix rights before an irrevocable change in position of the parties, which will jeopardize their respective claims of right.  Beahringer v. Page, 204 Ill. 2d 363, 373, 789 N.E.2d 1216, 1223 (2003); Roland Machinery Co. v. Reed, 339 Ill. App. 3d 1093, 1097, 791 N.E.2d 716, 719 (2003).  The statute is meant to allow parties to learn the consequences of their actions before they act.  Eyman v. McDonough District Hospital, 245 Ill. App. 3d 394, 396, 613 N.E.2d 819, 821 (1993).

The agreement in question is an executory agreement including a contingency clause that effectively cancels the parties' obligations under the agreement if Regency does not prevail in this action.  The agreement does not bar a declaratory action because, by its own terms, future conduct remains to be guided by a declaration of rights.  The agreement itself is not canceled by a finding adverse to Regency, but Regency is not obligated to perform although it could choose to do so knowing it

would be liable to Lopax and could then try to purchase Lopax's interests under their contract if that were to its benefit.

The cases cited by Lopax in support of the doctrine of nonliability for past conduct do not actually focus on that point but on the question of whether a declaratory-judgment action could serve some practical purpose in guiding the parties' future conduct. In Adkins, the court stated the doctrine of nonliability for past conduct bars an action for declaratory judgment only when the past conduct makes that party liable or amenable to suit. Adkins, 347 Ill. App. 3d at 378, 806 N.E.2d at 1277. Here, there is no commencement date on the lease agreement until this suit is resolved, so Pictor cannot access the proposed premises and operate a Buffalo Wild Wings restaurant until then. Lopax has not yet suffered any damages.

In Roland, Reed, one of the parties to a contract, attempted to revoke its acceptance of a bulldozer it had bought from Roland. Roland denied Reed was entitled to rescind its acceptance. Roland, 339 Ill. App. 3d at 1095-96, 791 N.E.2d at 717-18. The object of the declaratory judgment was whether Reed had a right to rescind its acceptance. Reed alleged Roland had already taken action by refusing to accept its rescission of acceptance and could not bring a declaratory-judgment action. The court found the action was to determine the consequences of future action: in the event Reed returned the dozer, would Roland be obligated to accept it and return the purchase price? Roland, 339 Ill. App. 3d at 1102, 791 N.E.2d at 723.

According to these cases, the only circumstance that would cause a court to dismiss a declaratory-judgment action would be where no future conduct is left to be guided by the court and the declaration would simply be a declaration of liability on past conduct. Here, the court was guiding Regency on whether to proceed with the agreement to commence the lease. Future actions must take place by both Regency and Pictor before Regency could become amenable to suit by Lopax. The fact these future actions have not yet occurred is fatal to Lopax's assertion that a declaratory judgment in this case is barred by the doctrine of nonliability for past conduct.

Although there was an agreement to lease, the language of the agreement precluded the parties from carrying out the lease before this case is resolved. According to the agreement, the lease term begins on the "[c]ommencement [d]ate," which is defined as the "date upon which the lawsuit referenced in section [33.34] has been resolved and the [l]ease will commence. Parties agree to sign a letter to set this date." By its own terms, the lease does not commence until "successful resolution of the lawsuit". Pictor cannot take possession until the commencement date, which is after this lawsuit is successfully resolved, _i.e._, in favor of Regency.

The lease term may not begin until the parties' rights are declared in this action. Depending on its outcome, the lease term may never commence. By the terms of the lease agreement, Pictor cannot begin operating any business that may compete with

Lopax's business until this suit is resolved.

The pivotal question is whether there is any future conduct to be guided by the court's declaration of rights. Roland Machinery, 339 Ill. App. 3d at 1102, 791 N.E.2d at 723. In this case, there is future conduct to be guided. Thus, the trial court was correct in denying Lopax's motion for summary judgment.

C. Production of the Entire Lease Agreement

Generally, rulings with regard to discovery are subject to the abuse-of-discretion standard of review. Reda v. Advocate Health Care, 199 Ill. 2d 47, 54, 765 N.E.2d 1002, 1007 (2002). Lopax contends if facts are uncontroverted and the issue is an application of law to facts, a reviewing court may determine the correctness of a discovery ruling independently of the trial court's judgment. Norskog v. Pfiel, 197 Ill. 2d 60, 70-71, 755 N.E.2d 1, 9 (2001).

In Norskog, the appeals court was deciding whether disclosure of mental-health information is prohibited by statutory discovery privilege and whether any exception to privilege applies. Thus, it was strictly a matter of law and reviewed de novo. Norskog, 197 Ill. 2d at 71, 755 N.E.2d at 9. Lopax notes in this case, the trial court ruled on its motion to compel after deciding the issue of the existence of the lease. Lopax contends the existence of the lease was a legal issue similar to the statutory-privilege issue in Norskog. If the lease existed, clearly it was relevant to Lopax's position on the applicability

- 27 -

of the declaratory-judgment statute. While production of the lease itself was not a legal issue, its existence was, just like the privilege in <u>Norskog</u>.

However, the existence of the privilege was not the issue in <u>Norskog</u> but whether the privilege applied in the particular circumstances. This case does not deal with a statutory discovery privilege. The lease agreement does not fall under a statutory or other privilege. The issue was simply its relevancy to one issue: whether Buffalo Wild Wings was a fast-food restaurant.

Relevant evidence includes not only what is admissible at trial but what leads to admissible evidence. <u>Manns v. Briell</u>, 349 Ill. App. 3d 358, 361, 811 N.E.2d 349, 352 (2004). Lopax contends a primary focus of its defense is the existence of the lease prior to the filing of the declaratory-judgment action. Therefore, it contends it is inconceivable to conclude the lease is irrelevant to issues raised in its motion for summary judgment, which was based solely on the existence of the lease prior to filing suit. Because it only had parts of the lease, Lopax argues it was not able to set forth a full and complete defense and was prejudiced by being forced to interpret limited sections of the lease produced based on Regency's opinion as to relevance. Lopax contends it should not be compelled to rely on Regency's assertions that only the clauses released are relevant or not subject to an assertion of proprietary business information.

Certain portions of the Pictor agreement are or could

be relevant to issues raised by Lopax in this matter, i.e., whether Buffalo Wild Wings is a fast-food restaurant and whether future conduct remains to be guided by the court's declaration of rights. Regency contended it produced those portions that (1) identified the parties, (2) touched on the nature of the Buffalo Wild Wings operation, or (3) made the entire relationship between Regency and Pictor contingent on the outcome of this action.

The threshold relevance requirement in discovery is whether items requested are actually relevant to issues in the case. See Manns, 349 Ill. App. 3d at 361, 811 N.E.2d at 352 (court does not have discretion to order discovery of information not meeting threshold requirement of relevance to matter actually at issue in the case). The trial court conducted an in camera review of the lease agreement and, thus, Lopax was not forced to rely on Regency's assertions of relevancy or proprietary information. In its ruling, the court noted it found nothing relevant to the issues in dispute, stating "nothing in these agreements refer to or can be interpreted to relate to a fast[-]food business."

While Lopax argued to the trial court its objection to the in camera review of the lease because it put the court in the position of an advocate for Lopax, which position only its own counsel could fill, it does not argue this point on appeal.

The issue of nonliability for past conduct, based on the existence of the lease agreement, was determined, as we have seen, based on the contingency clause, which clause was disclosed

- 29 -

to Lopax.  The relevancy of the remainder of the lease agreement as to the remaining issue of whether Buffalo Wild Wings was a fast-food restaurant was assessed by the trial court in its in camera review.  Thus, Lopax was not prejudiced by any interpretation of relevancy placed on the agreement by Regency.  We have reviewed the lease agreement at issue and find no abuse of discretion on the part of the trial court in denying Lopax's motion to compel disclosure.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

TURNER, J., concurs.

COOK, J., dissents.

JUSTICE COOK, dissenting:

I respectfully dissent.  I would reverse, and hold that Buffalo Wild Wings is a restaurant facility whose primary food product is chicken and accordingly barred by the contract.

Parol evidence should not be considered in this case. This contract contains an integration clause.  Paragraph 8.2 provides:

> "Entire Contract.  This [c]ontract con-
> stitutes the entire agreement between [s]eller
> and [b]uyer, and there are no other covenants,
> agreements, promises, terms and provisions,
> conditions, undertakings or understandings
> either oral or written, between them con-
> cerning the [p]roperty other than those herein
> set forth."

When a contract contains an integration clause, it is improper to consider extrinsic evidence of prior negotiations to create an extrinsic ambiguity.  Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457, 462-64, 706 N.E.2d 882, 884-85 (1999) ("four corners" rule).

Paragraph 4.1(h) of the contract prohibits use of the real estate for the purpose of conducting "any fast[-]food (QSR)

- 31 -

restaurant or restaurant facility whose principal food product is chicken." The language seems clear. A fast-food restaurant, like KFC, whose principal food product is chicken, is specifically prohibited. More broadly, any restaurant facility whose principal food product is chicken is also prohibited. The trial court found Buffalo Wild Wings not to be a fast-food restaurant, but there is no dispute that Buffalo Wild Wings's principal food product is chicken.

The parties agree that the words "whose principal food product is chicken" modify both "restaurant" and "restaurant facility." Regency argues the words "fast food (QSR)" modify both "restaurant" and "restaurant facility." The problem with Regency's argument is that there appears to be no difference between a fast-food "restaurant" serving primarily chicken and a fast-food "restaurant facility" serving primarily chicken. The parties agree there are two categories here and there has to be a difference between them, otherwise one of the categories is surplusage. The obvious difference is that "fast food" modifies only the word it precedes, not the words "restaurant facility" which follow later, after the word "or."

Regency, however, attempts to create a distinction between the two categories by a narrow and unusual definition of "restaurant facility" as "a limited food[-]service operation located in a multi-outlet food court, or embedded in a department store, shopping center, or similar retail setting." That definition is found only in the self-serving affidavit of Regency's

president, and is contradicted elsewhere in the agreement where KFC itself (a stand-alone restaurant) is referred to as a "restaurant facility." A "facility" is something that is built to serve a particular purpose, such as a medical facility, an educational facility, or a recreational facility. See Merriam Webster's Collegiate Dictionary 415 (10th ed. 2000) ("facility": "4b: something (as a hospital) that is built, installed, or established to serve a particular purpose"). There is no requirement that a "facility" be embedded in some other operation. The affidavit of Regency's president, which is relied on to show ambiguity, is extrinsic evidence used to create an extrinsic ambiguity in violation of the parol evidence rule. Air Safety, 185 Ill. 2d at 463-64, 706 N.E.2d at 885. There is no indication in the contract that the parties were concerned with embedded food operations. They were concerned with food operations like KFC, that served primarily chicken.

Our construction of contracts seems to vary between extremes. If we declare the contract not to be ambiguous, that is the end of the matter and we make no attempt to construe, interpret, or understand it. Dusthimer v. Board of Trustees, 368 Ill. App. 3d 159, 857 N.E.2d 343 (2006); Berryman Transfer & Storage Co. v. New Prime, Inc., 345 Ill. App. 3d 859, 863, 802 N.E.2d 1285, 1288 (2004). If we declare the contract to be ambiguous, we ignore the language of the contract and turn to any and all extrinsic evidence, even preliminary negotiations between the parties barred by the parol evidence rule. Slip op. at 8-9.

There should be a middle ground, where we focus on the language of the contract.  See, _e.g._, the Uniform Commercial Code (810 ILCS 5/2-202 (West 2004)), which allows terms to be explained or supplemented by usage of trade, or course of performance, but not contradicted by evidence of any prior agreement.  We should be reluctant to discard the parol evidence rule.  The parol evidence rule bars the introduction of the most questionable form of extrinsic evidence--self-serving testimony by one of the parties as to what the parties "really" agreed to in the negotiations leading up to the signing of the contract.  R. Posner, _The Law and Economics of Contract Interpretation_, 83 Tex. L. Rev. 1581, 1600 (2005).  The testimony of independent experts, however, may be considered.  _White City Shopping Center, LP v. PR Restaurants, LLC_, 21 Mass. L. Rptr. 565 n.4 (October 31, 2006) (a burrito is not a sandwich).

Paragraph 4.1(h) identifies some (but not all) specifically prohibited businesses, all of which seem to be fast-food chicken restaurants.  The paragraph goes on to describe another prohibited category:

> "Other than the aforementioned restaurants
> which shall absolutely be prohibited, a
> restaurant shall be deemed to 'feature bone-
> less chicken or chicken sandwiches' only if
> the primary business of such restaurant is
> the sale of such items."

That language is consistent with the construction that fast-food

- 34 -

restaurants whose principal food product is chicken are specifically prohibited, and more broadly, any restaurant facility whose principal food product is chicken is also prohibited. Paragraph 4.1(h) goes on to list some types of restaurants that are not prohibited, like dinner houses, seafood restaurants, Italian restaurants and "casual dining" restaurants. Those restaurants apparently do not primarily feature chicken. It is interesting that none of the examples given make any distinction between stand-alone restaurants and embedded restaurants, which Regency argues is the meaning of "restaurant facility."

Even if we were to consider the negotiations of the parties, those negotiations support Lopax's argument that there are two categories here, fast-food restaurants, and more broadly, any restaurant facility. Lopax wanted to "prohibit all fast-food restaurants, not just those serving primarily chicken." Slip op. at 12. Lopax also wanted to prohibit all restaurant operations serving chicken. "Indeed, Lopax's concern consistently was not over the level of service but the serving of chicken." Slip op. at 12. Regency/Arbours wanted to limit the prohibitions. Regency/Arbours refused to go along with a prohibition on all fast-food restaurants such as McDonald's. Regency/Arbours insisted that only restaurants "whose <u>principal</u> food product is chicken" (emphasis added) would be prohibited. From the beginning, the parties were discussing two categories, fast-food restaurants and restaurants in general. Regency/Arbours added similar restrictions to both categories, but the

- 35 -

parties never expressed the intent to limit the contract to fast-food restaurants, as they could have done by eliminating the second category.

The memoranda recorded April 17, 2002, and August 6, 2002, did not amend the contract. The purpose of recording a memorandum of contract is to put the public on notice that a contract exists. It is not necessary that the entire contract be recorded. A prospective buyer has the duty to investigate and determine the provisions of the contract. Smith, 402 Ill. at 465, 84 N.E.2d at 428 ("Under the circumstances present in this case, a prudent person would have sought light from [the] plaintiff. This, [the] defendants failed to do. They were not innocent purchasers for value"). The original memorandum here summarized the provisions of paragraph 4.1(h) in a single sentence. The amended memorandum discussed some of the paragraph's limitations (within one mile of the real estate; shall expire if use ceases for 90 days; dinner houses are allowed), perhaps because Regency was concerned that prospective buyers would see the recorded memorandum and not inquire further. The majority's construction of the memoranda does not read "restaurant facility" to mean embedded restaurant, as Regency argues, but instead serves to strike the term from the contract.