HOT LIGHT BRANDS, L.L.C., Plaintiff-Appellant, v. HARRIS REALTY, INC., *et al.*, Defendants-Appellees (Forest City Enterprises, Inc., *et al.*, Defendants).

Second District   No. 2—07—0694

Opinion filed June 23, 2009.

Jim J. Shoemake and Eric M. Walter, both of Guilfoil, Petzall & Shoemake

LLC, of St. Louis, Missouri, and Michael M. Roth and James B. Durkin, both of Ice Miller LLP, of Lisle, for appellant.

John A. Lipinsky and George S. Weems, both of Coman & Anderson, P.C., of Lisle, for appellees.

JUSTICE McLAREN delivered the opinion of the court:

Plaintiff, Hot Light Brands, L.L.C.,[1] appeals from the order of the trial court entering declaratory judgment in favor of defendants Harris Realty, Inc., Harris Seven Bridges, Inc., Forest City Enterprises, Inc., Seven Bridges Development, L.L.C., and LaSalle Bank National Association, as trustee under trust No. 65033.[2] We reverse.

On March 28, 2000, Hot Light and defendants entered into an agreement to purchase real property (agreement), in contemplation of Hot Light's purchase of an outlot in the Seven Bridges Development in Woodridge, Illinois. In July 2000, Hot Light paid defendants $915,000 for the property. The property was conveyed subject to certain covenants, conditions, and restrictions, which were attached to the trustee's deed (many of which were also contained in the agreement). Development of the property was subject to approval by an architectural review committee (ARC). The "current members" of the ARC, appointed by defendants, were listed in article 8 of the agreement as Tom Beaulieu, Fred Petermans, Bill Wittkamper, Peter Martin (chairman), and Jack Polsky. The members were not listed in the deed. The purpose of the ARC was to ensure that improvements to the property were "constructed in a first-class manner and in a manner that is functionally and architecturally consistent and compatible with all improvements constructed within the Development." Hot Light's "Contemplated Improvements" and its development of the property were, "and at all times shall remain, subject to the [ARC's] ongoing authority and rights." The ARC's rights included "the right to review and approve the specific uses" that Hot Light established for the property, "in furtherance of the Contemplated Use (as hereinafter defined)"; the right to determine that adequate parking was provided for "all uses established (or to be established)"; and the right to review and approve "all exterior building elevations, building materials, ease-

---

[1]Hot Light Brands, L.L.C., was formerly known as Sweet Traditions of Illinois, L.L.C. While many of the facts occurred while plaintiff was still known as Sweet Traditions, we will use the name Hot Light throughout this disposition.

[2]Defendants Forest City Enterprises, Inc., and LaSalle Bank National Association, as trustee under trust No. 65033, did not participate in the trial and are not part of this appeal.

ment plans and plans for landscaping and signage." In addition, "any subsequent modifications made to, or deviation from, an approved use of land or plan" was subject to "further review and approval of" the ARC. The "Contemplated Use" of the property was defined as "the operation of a Krispy Kreme Doughnut retail store with drive-thru and delivery facilities." The "Contemplated Improvements" were a 4,200-square-foot, one-story building with drive-through facilities, a loading and delivery zone, and related parking, walkways, landscaping, lighting, signage, and other site improvements. Hot Light then developed the property by building and operating a Krispy Kreme Doughnut shop.

On June 22, 2004, Forest City-Harris Group (FC-HG), Moser Enterprises, and Hagge Group 7 LLC formed Seven Bridges Development, L.L.C. (Seven Bridges), in order to "acquire a vacant parcel consisting of approximately 25.668 acres of land, located in the Seven Bridges Development," develop the property "with a first-class, upscale retail, commercial and/or office development, a hotel and possibly condominiums or townhomes," and "lease, sell, develop or otherwise manage the Property, for investment purposes." The planned acquisition did not include the Hot Light property. Section 5.24 of the Seven Bridges operating agreement provided that, upon the conveyance of the land to the venture, "the existing architectural committee shall be disbanded *as it relates to the [Seven Bridges] Property*, and FC-HG will cause a new architectural review committee ('Committee') *to be established for only the [Seven Bridges] Property*" (emphases added). The new ARC was to be comprised of four members: Peter Martin (chairman) and Tom Beaulieu from FC-HG; and John Zediker and Scott Hagge from Moser. If an ARC member from either FC-HG or Moser left the committee, notice of a new appointment was to be given to the other side.

In March 2006, Hot Light executed a letter of intent to sell its property to Citibank for $2,765,000. Citibank intended to convert the doughnut shop into a bank, retaining the drive-through window. Negotiations among representatives of Hot Light, Citibank, and defendants ensued. On August 27, a meeting was held involving three of the original ARC members (Martin, Beaulieu, and Wittkamper), two representatives from Hot Light, and three representatives from Citibank. On September 1, Martin sent a letter withholding approval of the proposed changes, stating that such changes would be "a material deviation from what was planned for the Seven Bridges Development." In addition, the letter noted that the Village of Woodridge did not think that a Citibank branch "was an appropriate use for this particular location within the Seven Bridges Development." Hot Light

asked for specific reasons for the denial of its request for approval. In a letter dated September 20, 2006, Martin informed Hot Light that, while Hot Light had failed to make a formal request for approval, the September 1 letter "may be considered the formal action" of the ARC. Citing section 1a of exhibit C of the trustee's deed, the ARC found that the use of the property "as a financial services institution is a material departure from the previously granted approval for use as a doughnut store." The ARC concluded that the requested changes "will negatively impact the traffic patterns and use of the parking spaces in the vicinity of the Property." The denial of the request was "based in part on this belief." The ARC's concern was not with Citibank but with "a financial services institution occupying space that was set aside for a food services establishment."

Hot Light filed a complaint for declaratory judgment, seeking a declaration that the ARC's refusal to approve the changes was unreasonable, improper, invalid, and void and that Hot Light had the right to sell the property for use as a bank. The trial court found in favor of defendants. This appeal followed.

Hot Light first contends that the ARC that purported to make the decision was composed of people who lacked authority over the property. Hot Light argues that neither the agreement nor the trustee's deed with attachments allowed defendants to unilaterally change, without notice to Hot Light, the composition of the ARC. Therefore, the trial court erred in finding that the requested changes were properly denied by the ARC. We agree.

Paragraph 8.1(a) of the agreement "informed" Hot Light that the "current members" of the ARC were Tom Beaulieu, Fred Peterman, Bill Wittkamper, Peter Martin, and Jack Polsky. Martin's address and telephone number were also given, as he was ARC chairman. The ARC representatives at the August 27, 2006, meeting with Hot Light and Citibank were Martin, Beaulieu, and Wittkamper. The September 1 letter denying the requested changes was signed by Martin on behalf of the ARC. Carbon copies of the letter were sent to Beaulieu and Wittkamper, along with John Zediker and Scott Hagge.

At trial, Zediker testified that there was only one ARC, which consisted of Martin, Beaulieu, Zediker, and Hagge. Beaulieu testified regarding an e-mail from Wittkamper to Martin, sent before the August 27 meeting, regarding Hot Light's requested changes. Hagge testified that he had never seen any document that gave the ARC named in the Seven Bridges operating agreement authority over the Hot Light property.

Paragraph 8.9 of the agreement stated that the provisions contained in article 8 shall survive the closing. Paragraph 9.7 provided

that the "Agreement shall not be modified by either Party by oral representations made before or after the execution of this Agreement, and all amendments to this Agreement must be in writing and signed by Buyer and Seller." Clearly, the composition of the ARC, the "current" version of which was listed in paragraph 8.1(a), was to survive the closing.

Defendants argue, and the trial court concluded, that the use of the term "current" in the description of the ARC's membership meant that the membership could change. Furthermore, defendants argue that they had the authority to appoint ARC members under paragraph 1(a) of exhibit C attached to the trustee's deed, which stated that defendants had appointed the ARC members, and that there are no provisions that restrict them from changing the membership of the ARC.

Neither the agreement nor the trustee's deed with its attachments spoke to any specific procedure for changing the composition of the ARC; while there was no specific restriction on changing the membership of the ARC, there was also no provision granting defendants the unilateral authority to change the membership of the ARC with no notice to Hot Light. Furthermore, the agreement contained a general prohibition against unilateral action—paragraph 9.7 of the agreement required amendments to be in writing and signed by both parties. Clearly, no such written amendment regarding the membership of the ARC was executed here.

●1 The problem inherent in defendants' argument is manifest. No one appears to know exactly who was on the ARC at the relevant time. Hot Light believed that the ARC membership was the same as that listed in the agreement. Three of those listed in the agreement were present at the August 27, 2006, meeting. However, defendants argue that the members of the Seven Bridges ARC were the ARC members in 2006, in spite of the fact that Seven Bridges was created to purchase and manage property that did not include the Hot Light property. In addition, neither Zediker nor Hagge, members of the Seven Bridges ARC, was present at the August 27, 2006, meeting, and Wittkamper, who was supposedly removed from the ARC in 2004, was present. Zediker, Hagge, and Wittkamper were all sent carbons of the letter from Martin denying Hot Light's request.

Pursuant to article 8.1(c) of the agreement, the ARC "shall" notify Hot Light of its approval or disapproval of any formal request for approval within 10 days. The failure to respond within that period "shall be conclusively deemed to mean that the [ARC] has approved" the request for approval. While Hot Light did not submit a formal request for approval as required by section 8.1(c) of the agreement and by

exhibit C of the trustee's deed, it and Citibank gave a presentation to the ARC on August 22, 2006. In the ARC's September 1 letter of denial, ARC chairman Martin noted Hot Light's lack of a formal request. However, Martin then agreed, on behalf of the ARC, that its September 1 denial, which was dated 10 days after the presentation, "may be considered the formal action of the Committee." As Martin notified Hot Light that the ARC considered its action to be a final decision on the plan, even in light of Hot Light's failure to submit a formal request, defendants cannot now argue that the lack of a formal request makes the resulting improper denial any less of an official action by the ARC. Furthermore, the submission of a formal request would have been a futile gesture after the ARC had formally denied the change.

Here, it cannot be said that a proper composition of the ARC notified Hot Light of its decision. The ARC as it was composed in the agreement did not meet and make a decision regarding Hot Light's request. Therefore, by operation of the agreement, the ARC failed to respond, which failure operated as an approval, and the trial court erred in entering judgment in defendants' favor.

Hot Light argues that, even if this court finds in its favor on its first contention, we should address the additional arguments in its brief because of the "likelihood of repetition of the disputes raised in this lawsuit." We agree, and we will address some of Hot Light's other contentions.

Hot Light next contends that the ARC did not have authority to withhold approval of the requested changes based on the merits or substance of the proposed changes; the ARC's authority extended only to architectural conformity and the adequacy of parking. This contention is based on the interpretation of the transaction documents, including the agreement and the trustee's deed. We review *de novo* questions of contract interpretation where there are no questions of fact to be resolved. *Geisler v. City of Wood River, Illinois*, 383 Ill. App. 3d 828, 839 (2008).

Hot Light first argues that the transaction documents created the ARC through the use of restrictive covenants and not, as the trial court held, restraints on alienation. Hot Light then argues that the restrictive covenants creating the ARC are ambiguous and should be construed against defendants. However, whether the documents contained restrictive covenants or restraints on alienation is irrelevant to the issue of ambiguity. Both types of restrictions are contract terms and must be analyzed under general contract principles regarding ambiguity. See, *e.g.*, *Gale v. York Center Community Cooperative, Inc.*, 21 Ill. 2d 86, 94 (1960) (restraint on alienation); *Sadler v. Creekmur*, 354 Ill. App. 3d 1029, 1036 (2004) (restrictive covenant).

A court's principal objective in construing a contract is to give effect to the intent that the parties possessed when they entered into the agreement. *Regency Commercial Associates, LLC v. Lopax, Inc.*, 373 Ill. App. 3d 270, 275 (2007). An agreement is to be interpreted as a whole; we should give meaning and effect to every provision when possible, and we will not interpret the agreement in a way that would nullify provisions or would render them meaningless. *Regency Commercial Associates, LLC*, 373 Ill. App. 3d at 275. If the terms of an agreement are unambiguous, we will ascertain the parties' intent solely from the words of the agreement itself. *Regency Commercial Associates, LLC*, 373 Ill. App. 3d at 275. Contract terms must be given their ordinary and natural meaning when they are unambiguous. *Dam, Snell & Taveirne, Ltd. v. Verchota*, 324 Ill. App. 3d 146, 154 (2001). An ambiguous agreement is generally construed against the drafter. *Mermelstein v. Menora*, 372 Ill. App. 3d 407, 421 (2007). Whether the language of an agreement is ambiguous is a question of law. *Regency Commercial Associates, LLC*, 373 Ill. App. 3d at 275.

The ARC was established in article 8 of the agreement and in exhibit C of the trustee's deed. Section 1 of exhibit C of the deed states in relevant part:

"1. *Architectural Review Committee.*

a. *** Forest City-Harris Group ('Developer') the beneficiary of Trustee, has appointed an architectural review committee (the 'Committee') which has certain rights and obligations with respect to the Property and the improvements to be constructed thereon in order to ensure that all improvements constructed with the Development are constructed in a first-class manner and in a manner that is functionally and architecturally consistent and compatible with all improvements constructed within the Development; that the ongoing authority and rights of the Committee are of critical value to Developer because of Developer's residual interests in the Development; and that Grantee's construction of the Contemplated Improvements (as hereinafter defined) and its development of the Property are and at all times shall remain, subject to the Committee's ongoing authority and rights. Such rights consist of the right to review and approve the specific uses that Grantee establishes on the Property, in furtherance of the Contemplated Use (as hereinafter defined), the right to determine that adequate parking is being provided and will be provided at all times for all uses established (or to be established) within the Development, and the right to review and approve all exterior building elevations, building materials, easement plans and plans for landscaping and signage for all improvements to be constructed on the Property. *** Grantee further acknowledges and understands that any subse-

quent modifications made to, or deviation from, an approved use of land or plan shall be subject to the further review and approval of the Committee, provided, however, that such approval shall be granted so long as such modifications or deviations do not materially depart from the previously granted approval.

b. Without limiting the foregoing, the Committee must approve *** the exterior architectural design of all Contemplated Improvements and the plans for all parking, service facilities, signs and landscaping on the Property before any construction of any kind may commence thereon in order to be assured that the improvements, parking, service facilities signs and landscaping will substantially conform with plans relating to Grantor's Project ***.

* * *

As used herein 'Contemplated Improvements' shall mean a one story building (the 'Building') measuring approximately 4200 square feet with drive-thru facilities and a loading and delivery zone proximate to the Building, and related parking, walkways, landscaping, lighting, signage and other site improvements related thereto as required by Grantee to be located on the property, *** and which improvements shall conform in quality and construction to the existing improvements in the Development.

As used herein 'Contemplated Uses' shall mean the operation of a Krispy Kreme Doughnut retail store with drive-thru and delivery facilities." (Emphasis in original.)

Hot Light argues that its intent at the time that it signed the transaction documents was to give to the ARC authority over issues related to the construction of improvements on the property, not over future uses of the property. However, Hot Light's intent is not the issue. A contract is not ambiguous merely because the parties disagree on its meaning. *Baxter International, Inc. v. American Guarantee & Liability Insurance Co.*, 369 Ill. App. 3d 700, 704 (2006). Ambiguity exists where language is obscure in meaning through indefiniteness of expression. *Baxter International, Inc.*, 369 Ill. App. 3d at 704.

Here, the deed describes the ARC as created "in order to ensure that all improvements constructed with the Development are constructed in a first-class manner and in a manner that is functionally and architecturally consistent and compatible with all improvements constructed within the Development." The ARC was also granted:

"the right to review and approve the specific uses that Grantee establishes on the Property, in furtherance of the Contemplated Use (as hereinafter defined), the right to determine that adequate parking is being provided and will be provided at all times for all uses established (or to be established) within the Development, and

the right to review and approve all exterior building elevations, building materials, easement plans and plans for landscaping and signage for all improvements to be constructed on the Property." While the ARC was clearly granted the authority to review and approve the "specific uses" that Hot Light "establishes on the Property, in furtherance of the Contemplated Use," it is not clear that the ARC had the same authority to review and approve the "Contemplated Use" of the property itself. The "Contemplated Use," which was defined as "the operation of a Krispy Kreme Doughnut retail store with drive-thru and delivery facilities," is distinct from the "uses" over which the ARC was granted authority, and it is separately defined. The ARC's enumerated rights and authority deal with issues such as parking, service facilities, signs, landscaping, exterior building elevations, building materials, and easement plans. These rights coincide with the expressed purpose of the ARC, which was created "in order to ensure that all improvements constructed with the Development are constructed in a first-class manner and in a manner that is functionally and architecturally consistent and compatible with all improvements constructed within the Development." Authority over the type of business to be conducted on the property appears to be beyond the purpose of the ARC.

The ARC was also expressly given the authority to review and approve "modifications made to, or deviation from, an approved use of land or plan," provided that approval "shall be granted so long as such modifications or deviations do not materially depart from the previously granted approval." If such authority included the right to approve the type of business to be operated, it would be difficult to imagine an immaterial deviation from a "Krispy Kreme Doughnut retail store with drive-thru and delivery facilities." Any use other than a doughnut shop would appear to be a material deviation from the previously granted approval, and thus this grant of almost automatic approval would appear to be meaningless as it relates to the business to be operated.

Our conclusion is further bolstered by evidence of another agreement to purchase that defendants placed in the record. In February 2004, MTB Partners LLC purchased property in the Seven Bridges Development with a contemplated use as "a sports-themed restaurant and bar known as Buffalo Wild Wings Grill and Bar." Article 8 of the agreement to purchase provided for an ARC, the "current members" of which were the same as those listed in the Hot Light agreement. Like the ARC in the case before us, the Buffalo Wild Wings ARC also had the "right to review and approve the specific uses that Buyer establishes on the Property, in furtherance of the Contemplated Use."

However, section 8.8, entitled "Use Restrictions," proceeded to prohibit no fewer than 15 specific uses, including bowling alley, pool hall, adult bookstore, and popcorn vendor. Other restrictions applied so long as other businesses in Seven Bridges, including certain restaurants and a movie theater, were still operating. MTB could "change the use of the Property from the Contemplated Use to any other lawful use," provided that the new use did not violate the use restrictions and did "not have any greater parking requirements than is required by the Village for the Contemplated Use." Prior to making the change, MTB was required to notify defendants of its desire to change the use, and defendants had 10 days to notify MTB if the desired use violated the use provisions.

It is clear from this agreement to purchase that defendants were well aware of how to limit the potential uses of property in the Seven Bridges development. They chose to place specific use restrictions on the Buffalo Wild Wings property; such restrictions were completely absent from the Hot Light agreement. Further, defendants required that approval of planned changes come through them, not the Buffalo Wild Wings ARC, even though that ARC had the same "right to review and approve the specific uses that Buyer establishes on the Property, in furtherance of the Contemplated Use" that the Hot Light ARC possessed. Despite defendant's contention, this same language contained in both documents cannot result in such obviously different outcomes.

■ It is not clear from the words of the agreement itself whether the ARC's authority to review and approve "the specific uses that Grantee establishes on the Property, in furtherance of the Contemplated Use" includes the right to approve the actual type of business to be conducted on the property. Therefore, as a matter of law, the agreement is ambiguous. An ambiguous agreement is generally construed against the drafter. *Mermelstein*, 372 Ill. App. 3d at 421. Here, Beaulieu testified that he had represented defendants in some of the negotiations with Hot Light. When asked if Hot Light made any attempt to negotiate the terms of article 8 of the agreement, which contained the provisions regarding the ARC, Beaulieu replied, "I don't recollect that they had; but if they had, we wouldn't have agreed to it anyway." As defendants authored the ambiguous language, we construe it against them. Therefore, we hold that the ARC had no authority to review and approve the type of business conducted on the property and had no authority to deny approval of Hot Light's proposed sale of the property to Citibank.

Because of our disposition of this issue, we need not address Hot Light's other contention.

For these reasons, the judgment of the circuit court of Du Page County is reversed.

Reversed.

BOWMAN and BURKE, JJ., concur.